446 So.2d 1049 (1984)
Ted HERRING, Appellant,
v.
STATE of Florida, Appellee.
No. 61994.
Supreme Court of Florida.
February 2, 1984.
Rehearing Denied April 11, 1984.
*1051 James B. Gibson, Public Defender, and Michael S. Becker, Asst. Public Defender, Daytona Beach, for appellant.
Jim Smith, Atty. Gen., Tallahassee, and Mark C. Menser, Asst. Atty. Gen., Daytona Beach, for appellee.
PER CURIAM.
The appellant, Ted Herring, was convicted of armed robbery and the first-degree murder of a convenience store clerk. In accordance with the jury's advisory recommendation, the trial judge imposed the death sentence. We have jurisdiction,[1] and affirm the conviction and sentence of death.
The following are the relevant facts. Shortly after 3:00 a.m. on May 29, 1981, a customer entered a Daytona Beach convenience store and found the store clerk dead. The clerk's body was lying on the floor behind the cash register counter. The customer and a newspaper distribution man who had arrived at the store called the police. In investigating the crime scene, the police found a note on the counter which read:
This is a hole-up put all the money in a papper bag change to then lay flat on the floor are get shot [sic].
A medical examiner testified that the store clerk suffered three gunshot wounds: (1) a *1052 wound to the left side of the head just forward of the left ear; (2) a wound to the left side of the neck; and (3) a wound to the palm of the left hand with an exit wound on the back side of the hand. The examiner also testified that the wound which caused the clerk's death was the wound to the head and that the clerk survived for no longer than a minute. It was determined that $23.34 was missing from the cash register.
Approximately two weeks after the robbery-murder, Herring was arrested after he was observed entering and exiting a vehicle which had been stolen in another convenience store robbery. He was taken to the Daytona Beach Police Department, where he was advised of his Miranda rights. Herring signed a written waiver of his Miranda rights and was interrogated by detectives. During the course of the interrogation, he was asked about several armed robberies, including the May 29 convenience store robbery-murder. A judgment of guilty in one of these other armed robberies was entered against appellant on January 8, 1982. Appellant, in his first statement, which was taped, told the detectives that he planned to rob the convenience store and prepared a holdup note which directed the clerk to turn over money or be shot. He claimed that when he proceeded to the counter, a second man came to the counter, pulled a gun, demanded money from the clerk, and then, after he was given the money, told the clerk to lie on the floor. As this occurred, Herring stated, he backed down the aisle of the store seeking cover and, while he was doing so, the other man shot the clerk twice and left the store. He stated he then ran from the store.
One of the investigating officers testified that after making this statement Herring asked to speak to the officer privately; that during this private conversation, Herring admitted that he killed the clerk and that his previous story was untrue. The officer also testified that during this conversation Herring said that he shot the clerk a second time to prevent him from being a witness against him. At trial, Herring denied that this conversation occurred.
Later in the interrogation, Herring made a third statement, which was taped. In this statement Herring confessed that he went to the convenience store with a gun, asked the clerk for cigarettes, and presented the holdup note. According to Herring, the clerk made a movement as if he were going to grab for the gun. Herring admitted that he then shot the clerk once in the head and once again after the clerk fell to the floor.
Herring testified that this third statement was given only because the police were harassing him. He admitted writing the holdup note, however, and one of the fingerprints on the note was identified as the appellant's.
At the conclusion of the guilt phase of the trial, the jury found appellant guilty of armed robbery and first-degree murder.
In the penalty phase of the trial, the state put into evidence a certified copy of the judgment and sentence for the prior unrelated robbery with a firearm, which judgment was entered on January 8, 1982. The state also presented the testimony of a probation and parole officer who had spoken to Herring in June, 1981, concerning the murder. She testified that Herring denied committing the murder but that he also commented that the man "got what he deserved for trying to play hero" and that the victim's death meant "one less cracker."
Appellant's mother testified on his behalf and stated that she and the appellant's father were divorced when the appellant was four years of age; that the appellant was treated for psychological problems and was diagnosed as hyperactive with learning disabilities; and that the appellant, who dropped out of school after completing the fifth grade, has an IQ of eighty. The appellant also attempted to present the testimony of three attorneys who had represented persons charged with first-degree murder who received life sentences after pleading guilty. This testimony was rejected by the trial court. The trial court also *1053 rejected the proffer of two poems authored by the appellant which were contained in a clinical report written about him. No testimony was proffered concerning the report, nor was the person who prepared the report called to testify.
By an eight-to-four vote the jury recommended the imposition of the death penalty. The trial judge imposed the death penalty, finding four aggravating and two mitigating circumstances. The aggravating circumstances found by the trial judge were: (1) that appellant had previously been convicted of a robbery with a firearm, a felony involving the use or threat of violence to a person; (2) that the murder was committed while appellant was engaged in the commission of a robbery; (3) that the murder was committed for the purpose of avoiding or preventing a lawful arrest; and (4) that the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. In mitigation, the trial judge found (1) that the appellant had a difficult childhood and had learning disabilities, and (2) that he was nineteen years old at the time of the crime.

Guilt Phase
The appellant's only contention of error with regard to the guilt phase of his trial is that the trial judge erred in excusing one of the prospective jurors for cause. Appellant asserts that he is entitled to a new trial because, in excusing this juror, the trial judge incorrectly applied the test for excusing death-scrupled jurors set out in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). We disagree.
The prospective juror, during the course of the voir dire examination, stated that he was opposed to the imposition of the death penalty under any circumstances, and that although he could possibly change his mind, at the moment he did not know of any circumstance which would cause him to change his mind. The prospective juror's specific responses to inquiry by the court and counsel were as follows:
THE COURT: Well, you're sort of straddling a fence and you need to sort of help me out here. There's nothing wrong or right with your views. It's just we need to know where you stand; and my question to you again is, would your objections, reservations or doubts about the death penalty interfere with your ability in the first phase to objectively determine guilt or innocence?
MR. CAMERON: No.
THE COURT: All right.
MR. CAMERON: It would not.
THE COURT: Okay. Now, the second question: If the Defendant was proven guilty beyond every reasonable doubt, could you return a verdict of guilty knowing that the death penalty was a possibility?

MR. CAMERON: Right now I think I could not. I might change my mind in the middle of the trial. It's a possibility.
THE COURT: Okay. You feel that you would refuse to impose the death penalty under any circumstance?

MR. CAMERON: I feel that way now.

THE COURT: Okay.
Counsel, I'm going to open it up to question by the State and the Defense.
Ma'am?
MS. GRAZIANO: Mr. Cameron, just to make sure I understand you correctly, the way you feel right now, there are no circumstances whatsoever that you would be able to recommend the death penalty?

MR. CAMERON: That's true.

MS. GRAZIANO: I have no further questions.
MR. PEARL: Mr. Cameron, I'm Howard Pearl from the Public Defender's office. I'd like to put to you a question or give you an example which is admittedly extreme because what we're asking you about is, are there any circumstances under which you might vote in favor of the death penalty; and, let me give you an extreme example.
Imagine, if you will, that the Defendant on trial for murder were Adolph Hitler *1054 or Idi Amin who caused the cold-blooded murder and death of millions of people. If that were true and if either one of these people were found guilty of murder in the first degree, would you consider the death penalty?
MR. CAMERON: I would consider it, but I think I'd find alternatives that I would choose.
MR. PEARL: Well, you cannot choose alternatives except for two, as the Judge has instructed you. There are only two in the event of a conviction of first degree murder. One is life in prison with a minimum of 25 years before parole, and the other is death. There are no other alternatives. There are no social engineering things that you can apply. There's no way you can change the person involved, in that sense. So, all you can do is choose one of those two alternatives as a juror, and you have said that you would follow the law.
MR. CAMERON: Uh-huh.
MR. PEARL: And, therefore, I ask you under such an extreme circumstance where the person that you had on trial who was convicted of first degree murder was a person of the caliber I have named, could you then, knowing your alternatives and not being able to choose others, vote for the death penalty?
MR. CAMERON: Under emotional influence I might.
MR. PEARL: Once again, I have to clear this up for you.
Serving on a jury is not supposed to be an emotional experience. You're supposed to bring to it your common sense, your logic, your everyday business sense; and you're supposed to leave emotion aside.
MR. CAMERON: If I was able to talk and think logically, I probably would not. I'm sure I would not.
MR. PEARL: Well, could you?
MR. CAMERON: I mean, I'm sure I would not recommend the death penalty.

MR. PEARL: Well, you would be amongst eleven other jurors. You would be one of twelve.
MR. CAMERON: Yes.
MR. PEARL: On the one hand, would you exercise independent judgment in your thinking?
MR. CAMERON: Yes.
MR. PEARL: And, on the other, would you listen to the views and respect the views of your fellow jurors in arriving at your verdict and discuss the case?
MR. CAMERON: I would listen, yes.
MR. PEARL: Would you be receptive to logical argument with respect to the death penalty if you were to hear such logical argument and respond to it and perhaps be able to then vote in favor of it if you felt that the argument was compelling?
MR. CAMERON: I would listen to it. I would not anticipate that I would change my mind.
MR. PEARL: Well, then I think  correct me if I'm wrong  I think what you have said is, although you're opposed to it and although you're thinking now is that you would not vote for the death penalty, that, on the other hand, there are or may be circumstances under which you would, although you do not know what those circumstances might be at the present time?
MR. CAMERON: It's a possibility I could change my mind. That's true.
MR. PEARL: Thank you, sir.
THE COURT: All right, Counsel. Is there a motion?
MS. GRAZIANO: The State moves that Mr. Cameron be stricken for cause.
MR. PEARL: I oppose it, Your Honor. I believe that Mr. Cameron could  is qualified to consider the death penalty and to make a decision at the proper time.
(Emphasis added.)
As noted, at the beginning of the inquiry the prospective juror stated that, with his present feelings, if he knew the death penalty was a possibility he would have difficulty rendering a verdict of guilty. The *1055 juror unequivocally stated that he knew of no circumstance whatsoever in which he would be able to recommend the death penalty. When pressed by appellant's counsel concerning the alternatives of either a life or death sentence, and given the examples of Adolph Hitler and Idi Amin, the prospective juror responded that he might recommend the imposition of the death penalty "under emotional influence." When reminded by counsel for the appellant that he must "leave emotion aside," the prospective juror stated, "I'm sure I would not recommend the death penalty."
In footnote 21 of Witherspoon, the United States Supreme Court set forth a test for determining when the state may excuse a prospective juror for cause in a death penalty case.[2]Witherspoon requires a trial court to determine whether or not a prospective juror is "irrevocably committed ... to vote against the penalty of death regardless of the facts and circumstances... ." 391 U.S. at 522 n. 21, 88 S.Ct. at 1777. The United States Supreme Court reaffirmed this principle in Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), where it concluded that a prospective juror may be excused for cause when his answers reveal a view toward capital punishment which would "substantially impair the performance of his duties as a juror" in the penalty phase of the trial. Id. at 45, 100 S.Ct. at 2526.
This Court is familiar with the Eleventh Circuit Court of Appeals' recent interpretation of Witherspoon and Adams in Witt v. Wainwright, 714 F.2d 1069 (11th Cir.1983), which held that Witherspoon and Adams did not allow a juror to be excused for cause where the juror responded that she did not "think" that she could put aside her feelings and be an impartial juror where the death penalty was involved. Without accepting the Eleventh Circuit's construction of Witherspoon and Adams, we find that in the instant case the prospective juror did more than "think" that his views would interfere with the performance of his duty as a juror. We conclude that the prospective juror in the instant case was properly discharged for cause because the record clearly reflects that, at the time of the inquiry, the juror's views would "substantially impair the performance of his duties as a juror," Adams, in the penalty phase of the trial and would also affect him in making a decision in the guilt phase of the trial.
It would make a mockery of the jury selection process to rule otherwise for it would allow persons with fixed opinions to sit on juries. To permit a person to sit as a juror after he has honestly advised the court that he does not believe he can set aside his opinion is unfair to the other *1056 jurors who are willing to maintain open minds and make their decision based solely upon the testimony, the evidence, and the law presented to them.
Although appellant has raised no other issues with respect to the guilt phase of his trial, we have reviewed the record in this case and find that there is substantial competent evidence to support the appellant's conviction. From our examination of the record, we find no reversible errors in the guilt phase of appellant's trial.

Sentencing Phase
Herring contends that his sentence should be vacated and a new sentencing trial granted because (1) the trial court refused to allow testimony by attorneys who represented other murder defendants in similar cases who were able to obtain life sentences; (2) the trial court improperly excluded two poems written by appellant which were offered in mitigation; (3) the trial court erred in finding as an aggravating circumstance that the murder was committed for the purpose of avoiding or preventing a lawful arrest; (4) the trial court erred in finding the aggravating circumstance that the murder was committed in a cold, calculated, and premeditated manner; (5) the trial court improperly used the aggravating circumstance that the murder was committed during the commission of a felony when that felony formed the underlying basis for the felony-murder conviction; and (6) Florida's capital sentencing statute is unconstitutional on its face and as applied in this case.
Appellant's points five and six merit no discussion. Both points have been considered and rejected by this Court in prior cases. See Menendez v. State, 419 So.2d 312 (Fla. 1982); Antone v. State, 382 So.2d 1205 (Fla.), cert. denied, 449 U.S. 913, 101 S.Ct. 287, 66 L.Ed.2d 141 (1980).
As to his first contention, appellant argues that under Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the trial judge should have allowed defense counsel for other first-degree murder defendants to testify that their clients received life sentences for similar crimes. The testimony sought to be presented reflects that these defendants were able to plead guilty and receive a life or lesser sentence. We have previously held that evidence concerning sentences imposed upon codefendants must be admitted in the penalty phase in order to allow the jury to know all the facts and circumstances surrounding an offense and its participants. See Downs v. State, 386 So.2d 788 (Fla.), cert. denied, 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 238 (1980); Salvatore v. State, 366 So.2d 745 (Fla. 1978), cert. denied, 444 U.S. 885, 100 S.Ct. 177, 62 L.Ed.2d 115 (1979); Smith v. State, 365 So.2d 704 (Fla. 1978), cert. denied, 444 U.S. 885, 100 S.Ct. 177, 62 L.Ed.2d 115 (1979); Messer v. State, 330 So.2d 137 (Fla. 1976), cert. denied, 456 U.S. 984, 102 S.Ct. 2259, 72 L.Ed.2d 863 (1982). These cases do not hold, however, that the circumstances and sentences in other death penalty cases must be admitted in the sentencing phase of the trial. Evaluating the sentences of other defendants in unrelated crimes involves a number of variables. There is no requirement in Lockett for the admission of such evidence in the sentencing phase. What Lockett does require is the admission of evidence that establishes facts relevant to the defendant's character, his prior record, and the circumstances of the offense in issue. 438 U.S. at 604-605 n. 12. The jury's responsibility in the process is to make recommendations based on the circumstances of the offense and the character and background of the defendant. The trial court, in determining the sentence to impose, must use its judicial experience in evaluating and weighing the aggravating and mitigating circumstances with the recommendation of the jury. The use of sentences imposed on other defendants relates to the proportionality of the sentence and is an appropriate element to be considered by the trial judge in imposing sentence upon the defendant, but is not a matter for the jury. This Court also has the responsibility to determine whether the sentence is proportionate with other death penalty cases. In the instant case the trial *1057 judge correctly excluded from the jury the proffered testimony concerning sentences imposed in unrelated capital cases.
Appellant's second claim is that the trial judge improperly excluded certain poems written by the appellant which were offered as mitigating evidence. These poems were contained in a clinical report about the appellant. The record reflects that appellant's counsel attempted to read the poems into evidence without identifying the report or offering it into evidence or calling the person who wrote it to testify. Under these circumstances, we find that the trial judge correctly excluded these poems from evidence.
Appellant's third point is that the trial court erred in finding the aggravating circumstance that the murder was committed for the purpose of avoiding or preventing a lawful arrest. The evidence in the record is uncontroverted that the appellant shot the clerk while he was standing behind the counter and shot him again after he had fallen to the floor. There was also testimony from a detective that appellant stated that he "shot a second time to prevent him [the clerk] from being a witness against him." This evidence is, in our view, sufficient to establish the appellant's intent to kill the store clerk in order to eliminate him as a witness.
Appellant's fourth point is that the trial judge improperly found the aggravating circumstance that this murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. We have previously stated that this aggravating circumstance is not to be utilized in every premeditated murder prosecution. Rather, this aggravating circumstance applies in those murders which are characterized as execution or contract murders or witness-elimination murders. We have also held, however, that this description is not intended to be all inclusive. See Menendez; McCray v. State, 416 So.2d 804 (Fla. 1982); Combs v. State, 403 So.2d 418 (Fla. 1981), cert. denied, 456 U.S. 984, 102 S.Ct. 2258, 72 L.Ed.2d 862 (1982). In the instant case, the evidence does reflect that appellant first shot the store clerk in response to what appellant believed was a threatening movement by the clerk and then shot him a second time after the clerk had fallen to the floor. The facts of this case are sufficient to show the heightened premeditation required for the application of this aggravating circumstance as it has been defined in McCray; Jent v. State, 408 So.2d 1024 (Fla. 1981), cert. denied, 457 U.S. 1111, 1102 S.Ct. 2916, 73 L.Ed.2d 1322 (1982); and Combs.
The trial court did find, as mitigating circumstances in this case, that the appellant had a difficult childhood, had learning disabilities, and that he was nineteen years of age at the time of this offense. It is within the province of the trial court to decide the weight to be given particular mitigating circumstances and whether they offset the established aggravating circumstances. As we have repeatedly stated since the initial principles for reviewing death sentences were laid down in State v. Dixon, 283 So.2d 1 (Fla. 1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974), Florida's death penalty statute does not comprehend the mere tabulation of aggravating and mitigating circumstances to arrive at a specific result. The aggravating and mitigating circumstances must be weighed by the trial judge in imposing the appropriate sentence. This Court must then review that sentence and consider the circumstances in the light of other decisions determining whether the death penalty is appropriate. See Menendez. We conclude that the established aggravating circumstances outweigh the mitigating circumstances. We have affirmed the imposition of the death sentence in cases involving similar robbery-murders where the defendants were of a youthful age and lacked prior significant criminal activity. See Hargrave v. State, 366 So.2d 1 (Fla. 1978), cert. denied, 444 U.S. 919, 100 S.Ct. 239, 62 L.Ed.2d 176 (1979), and Meeks v. State, 339 So.2d 186 (Fla. 1976), cert. denied, 439 U.S. 991, 99 S.Ct. 592, 58 L.Ed.2d 666 (1978). The mitigating circumstance *1058 of no prior significant criminal activity is not present in this case; in fact, appellant had been previously convicted of an armed robbery. From our review, the imposition of the death penalty is proportionately correct.
For the reasons expressed, we affirm appellant's conviction and the imposition of the death sentence.
It is so ordered.
ALDERMAN, C.J., and ADKINS, BOYD, OVERTON, McDONALD and SHAW, JJ., concur.
EHRLICH, J., concurs in part and dissents in part with an opinion.
EHRLICH, Justice, concurring in part and dissenting in part.
I concur in both the conviction and the sentence. I do not, however, agree that the record supports a finding of heightened premeditation sufficient to characterize the murder as cold, calculated and premeditated. The majority relies on the second shot, fired after the clerk was on the floor, as evidence of the heightened premeditation. But the record clearly shows the shot was fired within the same time-frame as the first. While I agree that more than enough time elapsed to allow for premeditation, I cannot agree that appellant had sufficient time for cold calculation. We have, since McCray and Combs, gradually eroded the very significant distinction between simple premeditation and the heightened premeditation contemplated in section 921.145(5)(i), Florida Statutes (1981). Loss of that distinction would bring into question the constitutionality of that aggravating factor and, perhaps, the constitutionality, as applied, of Florida's death penalty statute.
NOTES
[1] Art. V, § 3(b)(1), Fla. Const.
[2] Footnote 21 reads as follows:

21. Just as veniremen cannot be excluded for cause on the ground that they hold such views, so too they cannot be excluded for cause simply because they indicate that there are some kinds of cases in which they would refuse to recommend capital punishment. And a prospective juror cannot be expected to say in advance of trial whether he would in fact vote for the extreme penalty in the case before him. The most that can be demanded of a venireman in this regard is that he be willing to consider all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings. If the voir dire testimony in a given case indicates that veniremen were excluded on any broader basis than this, the death sentence cannot be carried out even if applicable statutory or case law in the relevant jurisdiction would appear to support only a narrower ground of exclusion. See nn. 5 and 9, supra.
We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt. Nor does the decision in this case affect the validity of any sentence other than one of death. Nor, finally, does today's holding render invalid the conviction, as opposed to the sentence, in this or any other case.
391 U.S. at 522-23, 88 S.Ct. at 1777.