**UNITED STATES**

v.

**Len DAVIS, et al.**

**No. CR. A. 94–381.**

United States District Court,
E.D. Louisiana.

May 16, 2001.

Michael McMahon, Gaynell Williains, Asst. U.S. Attys., New Orleans, LA, for Plaintiff.

Julian R. Murray, Jr., Metairie, LA, Carol Kolinchak, New Orleans, LA, for Defendants.

Len Davis, New Orleans, LA, Pro se.

### ORDER AND REASONS

BERRIGAN, District Judge.

Before the Court is the Government's Motion to Reconsider Hybrid Representation. (Rec.Doc. 898). For the reasons explained below, the Motion is GRANTED. In light of this ruling, the Government's Motion for a Mental Status Examination (Rec.Doc. 876) is DENIED AS MOOT.

The issue before the Court is who will determine and who will present Len Davis' ("Davis") defense at his upcoming sentencing hearing. The government contends that hybrid representation should be precluded and that Davis be either represented by counsel or proceed *pro se*, with standby counsel. Davis requests hybrid representation.[1] For the reasons stated below, the Court concludes that Davis does not have a constitutional right to self-representation at the penalty phase of this capital case. The Court further concludes that even if such a right exists, it is overcome by the more compelling Eighth Amendment and Fourteenth Amendment requirements that the death penalty not be imposed arbitrarily and capriciously. Similarly, Davis does not have a constitutional or statutory right to "hybrid" representation.[2] The Court concludes that the Con-

---

1. *See* Rec. Doc. 905. "Under a hybrid form of representation, defendant and counsel act, in effect, as co-counsel, with each speaking for the defense during different phases of the trial." 3 Wayne R. LeFave et al., *Criminal Procedure* § 11.5(g) (2d ed.1999).

2. *See, e.g., Neal v. Texas,* 870 F.2d 312, 315—16 (5th Cir.1989) ("A criminal defendant does

stitution calls for Davis to be represented by counsel and that counsel shall determine how the penalty phase should be conducted. In our adversary system of justice, the goal of the prosecution in the penalty phase of a capital case is to present the evidence and argument justifying the death penalty; the goal of counsel for the defense is to present the evidence and argument justifying a sentence of life imprisonment instead. Counsel for Davis are hereby instructed to determine, prepare and present the defense they consider to be the most persuasive, hopefully with, but, if necessary, without the cooperation or acquiescence of the defendant.

When this case was remanded for a new penalty phase, defendant Davis initially stated he wished to represent himself. He nonetheless consented to the assistance of standby counsel. Davis' consistent position throughout these proceedings has been to forgo the traditional mitigation testimony of family members or friends and instead focus an attack on the strength of the government's case as to guilt.[3] In his most recent filing with this Court,[4] Davis stated that he does not intend to present a defense at the penalty phase at all. These various positions have been taken against the advice of his counsel.

Davis is not dissatisfied with his standby counsel; indeed they have established a successful attorney/client relationship, with counsel arguing a number of Davis' pretrial motions.[5] The Court has also been advised by counsel on several occasions that Davis has not obstructed their efforts to develop mitigation evidence.

*Self–Representation*

■ While Davis at this point has no dissatisfaction with his standby counsel, he had indicated throughout these proceedings his intention to decide how the defense penalty phase will be handled. Standby counsel likewise has perceived their role as abiding by his decisions, whether they agree with them or not. The current arrangement is premised on the assumption that Davis has the right of self-representation, ergo, the right to "call the shots" at the sentencing phase of this capital case.

In *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the United State Supreme Court held that a defendant in state court has a constitutional right to go to trial without counsel if he has voluntarily and intelligently chosen to do so.[6] Faretta was charged with theft and his explanation for wanting to proceed *pro se* was because he perceived his public defender to be overloaded with work. *Id.* at 807, 95 S.Ct. 2525. As support for allowing self-representation, the Supreme Court looked to historic precedent in the Sixth Amendment, and in English and ear-

---

not have the right to a 'hybrid representation,' partly by counsel and partly by himself."). In light of the Court's ruling, it is unnecessary for the Court to consider whether in the exercise of judicial discretion, it should allow hybrid representation.

3. The Court previously questioned Davis *in camera* but on the record regarding this decision and was persuaded that Davis was competent to make such a decision. The Court subsequently ruled that "residual doubt" as to guilt is a legitimate mitigating factor that can be argued in the penalty phase.

4. *See* Rec. Doc. 905.

5. The Court is not construing Davis' cooperation with counsel as a waiver of his claim to primarily represent himself. The cooperation is being cited solely for the purpose of showing he has no complaint regarding their representation.

6. 28 U.S.C. § 1654, as well as its predecessor statute, has provided such a statutory right to litigants in federal court since 1789.

ly American colonial jurisprudence. The right to self-representation was firmly entrenched in the colonies in large part because lawyers were viewed with distrust and associated with the British Crown. *See id.* at 826—27, 95 S.Ct. 2525. While the Supreme Court acknowledged that in modern times it is ill-advised for a defendant to forgo counsel, *see id.* at 832—34, 95 S.Ct. 2525, it declared the "right to defend" to be "personal" because the "defendant, and not his lawyer or the State will bear the personal consequences of a conviction." *Id.* at 834, 95 S.Ct. 2525. The defendant's choice "must be honored out of that respect for the individual which is the lifeblood of the law." *Id.* (internal quotation and citations omitted). The Supreme Court nonetheless required that the trial court advise such a defendant of the perils of self-representation so that the record will show an intelligent and knowing waiver. *See id.* at 835, 95 S.Ct. 2525.

The *Faretta* decision was not unanimous. Three justices vehemently dissented, alarmed at the "obvious dangers of unjust convictions" and the "drastic curtailment of the interest of the State in seeing that justice is done in a real and objective sense." *Id.* at 851, 95 S.Ct. 2525 (Blackmun, J., dissenting, joined by Burger, C.J., and Rehnquist, J.).

While *Faretta* established a constitutional right to self-representation, this right has never been held to be absolute. In *Faretta* itself, the Supreme Court acknowledged that a trial judge may terminate self-representation if a defendant is deliberately disruptive. *Id.* at 834 n. 46, 95 S.Ct. 2525. The trial judge may also appoint "stand-by counsel"—even over the defendant's objection—to assist the accused. *Id.* In a later decision, the Supreme Court held that standby counsel could even intervene in the proceedings, unsolicited and contrary to the defendant's

wishes, as long as the defendant "had a fair chance to present his case in his own way." *McKaskle v. Wiggins,* 465 U.S. 168, 177, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984). The Supreme Court also pointed out that a *pro se* defendant "must generally accept any unsolicited help or hindrance that may come from the judge who chooses to call and question witnesses, from the prosecutor who faithfully exercises his duty to present evidence favorable to the defense, from the plural voices speaking 'for the defense' in a trial of more than one defendant, or from an amicus counsel appointed to assist the court." *Id.* at 177 n. 7, 104 S.Ct. 944 (internal citation omitted).

In a case decided just last year, the Supreme Court stated that the *Faretta* holding "was confined to the right to defend oneself at trial" and that a defendant does not have a right of self-representation on appeal. *Martinez v. Court of Appeal,* 528 U.S. 152, 154, 120 S.Ct. 684, 145 L.Ed.2d 597 (2000). The Supreme Court distanced itself from its earlier reliance on the historic precedent, noting that the precedent cited in *Faretta* arose at a time when lawyers were scarce and often mistrusted. *Id.* at 156, 120 S.Ct. 684. The Supreme Court also pointed out that the Sixth Amendment covers the preparation for trial and the trial itself, but not appeal. *Id.* at 159—60, 120 S.Ct. 684. Significantly for our purposes here, the Supreme Court stated that "the status of the accused defendant, who retains the presumption of innocence throughout the trial process, changes dramatically when a jury returns a guilty verdict." *Id.* at 162, 120 S.Ct. 684. Furthermore, "the autonomy interests that survive a felony conviction are less compelling than those motivating the decision in *Faretta.* Yet the overriding state interest in the fair and efficient administration of justice remains as strong as at the trial level." *Id.* at 163, 120 S.Ct. 684.

Here, as in *Martinez*, the defendant has been convicted. In addition, two of Davis' three convictions have now been upheld on appeal, further eroding any "autonomy interests" he may have had. On the other hand, the "overriding" government interest in the "fair administration of justice" has not been diminished.

*Sentencing and Self–Representation*

The *Faretta* case involved a trial on the merits of a noncapital offense. It did not purport to determine the right of self-representation once a person is convicted and is facing sentencing for the crime. Nor did it purport to speak to the penalty phase of a capital case.

While it may be facially tempting to extend the *Faretta* right of self-representation into sentencing, considering that, as with a conviction, the defendant is the one who "will bear the personal consequences"[7] of the sentence, significant other societal interests are at stake. These interests are substantially broader than concern about the fate of the particular offender. 18 U.S.C. § 3553 provides that the purpose of a sentence is to: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and, finally (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. The trial court in *United States v. Collado Betancourt*, 405 F.Supp. 1063 (D.P.R.1975) articulated the sentencing principles well:

First, that the purpose of a sentence combines community protection, correc-

tion, rehabilitation, deterrence and punishment, and it is for the sentencing judge to determine the proportionate worth, value and requirement of each of these elements in imposing sentence in each case. Second, that the prime consideration in proper sentencing is the public welfare; and third, that a proper sentence is a composite of many factors....

*Id.* at 1064.

While defendants have certain guaranteed autonomy at trial, and can represent themselves and can even choose to plead guilty to a crime, they do not have the prerogative to select their sentence.[8] That is not their decision to make. That decision is made by society, through constitutionally valid legislative enactments of penalty provisions and selection of the particular sentence within that range, usually by the judge. The decision is based on multiple policy considerations, the most important one being as stated above, "the public welfare."

Public policy has long recognized, however, the importance of individualizing a sentence to the particular offender and his crime. *See, e.g., Gregg v. Georgia*, 428 U.S. 153, 189, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). In order to do so, judges are expected to gather information from a wide range of sources.

[B]oth before and since the American colonies became a nation, courts in this country and in England practiced a policy under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of the punishment to be imposed....

---

7. *Faretta*, 422 U.S. at 834, 95 S.Ct. 2525.

8. Under Fed.R.Crim.P. 11(e)(1)(C), a plea may be conditioned on the defendant receiv-

ing a particular sentence, but even in that instance, the court has the discretion to reject the plea agreement and void the plea.

*Williams v. New York,* 337 U.S. 241, 246, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949). In choosing a sentence, the judge needs "the possession of the fullest information possible concerning the defendant's life and characteristics." *Id.* at 247, 69 S.Ct. 1079.

Under current federal law, in noncapital sentencing, the probation department "must make a presentence investigation and submit a report to the court before the sentence is imposed" unless the court has sufficient information from other sources and explains such on the record. Fed. R.Crim.P. 32(b)(1). Furthermore, that report "must" contain "information about the defendant's history and characteristics, including any prior criminal record, financial condition, and any circumstances that, because they affect the defendant's behavior, may be helpful in imposing sentence or in correctional treatment." Fed.R.Crim.P. 32(b)(4). Prior to 1987, Rule 32 allowed a defendant to waive a presentence report, *but only with the permission of the court.* That waiver was deleted in the most recent version of Rule 32. A defendant now cannot abort or waive such an investigation. *See United States v. Turner,* 816 F.Supp. 1102, 1103 (E.D.Va.1993); *see also* Sentencing Guideline 6A1.1, Commentary.

Certainly, a defendant can refuse to provide information himself, but this refusal does not prevent the judge from seeking information about the defendant from other sources for purposes of determining the appropriate sentence. Indeed, the judge is required to do so. In *McKnabb v. United States,* 551 F.2d 101 (6th Cir. 1977), the defendant refused to be interviewed by the probation department and the judge then refused to order a presentence report prior to sentencing. The Sixth Circuit concluded this would have been reversible error but for the fact that later on, in connection with a post-sentence motion, a sentence investigation report was in fact prepared and presented to the judge. *See id.* at 104—05; *see also People v. Martinez,* 2001 WL 360836, —— P.3d —— (Colo.App.2001).

Had Davis been convicted of a noncapital crime, he could have refused to be interviewed for purposes of the presentence investigation. Other than that, however, it is clear that he would have had no right, constitutional or statutory, to prevent the judge from gathering any and all other available information in connection with a noncapital sentencing.

For the above reasons, this Court concludes that the *Faretta* right to self-representation does not extend to criminal sentencing, and more specifically, does not extend to preventing the investigation and presentation of all relevant information regarding an offender to the sentencing authority. Furthermore, even if *Faretta* does extend to criminal sentencing, those interests are outweighed by Eighth Amendment considerations, particularly in the context of a capital case.

*Capital Sentencing and Self–Representation*

*Faretta* was a noncapital case. The United States Supreme Court has frequently acknowledged the fundamentally different character of a death sentence from other sentences.

> The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity.

*Furman v. Georgia,* 408 U.S. 238, 306, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Stewart, J., concurring).

While individualized sentencing has evolved in noncapital cases as a matter of policy, the Supreme Court has declared individualization "essential" in capital cases in light of the "profoundly different" penalty of death. *Lockett v. Ohio,* 438 U.S. 586, 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). "The nonavailability of corrective or modifying mechanisms with respect to an executed capital sentence underscores the need for individualized consideration as a constitutional requirement in imposing the death sentence." *Id.*

In *Furman,* the Supreme Court struck down the then-current death penalty statutes in Georgia and Texas as violating the Eighth Amendment ban against cruel and unusual punishment, applied to the state through the Fourteenth Amendment.[9] Differing rationales were given, but one of the most often cited is Justice Stewart's concurring opinion. Given the totally unguided discretion that juries were granted to determine which eligible offenders would be executed, Justice Stewart declared the death penalty to be cruel and unusual "in the same way that being struck by lightning is cruel and unusual." 408 U.S. at 309, 92 S.Ct. 2726 (Stewart, J., concurring). "[T]he Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed." *Id.* at 310, 92 S.Ct. 2726 (Stewart, J., concurring).

In 1976, the Supreme Court considered the constitutionality of several state death penalty statutes which were enacted in the wake of *Furman* in an effort to avoid those discretionary pitfalls. In *Gregg v. Georgia,* the high court began its discussion with a reference to Fed.R.Crim.P. 32, *discussed supra,* regarding the require-

ment of presentence reports in noncapital sentencings:

> If an experienced trial judge, who daily faces the difficult task of imposing sentences, has a vital need for accurate information about a defendant and the crime he committed in order to be able to impose a rational sentence in the typical criminal case, then accurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die by a jury of people who may never before have made a sentencing decision.

428 U.S. at 190, 96 S.Ct. 2909. The rationale for jury sentencing in capital cases is to "maintain a link between contemporary community values and the penal system a link without which the determination of punishment could hardly reflect 'the evolving standards of decency that mark the progress of a maturing society.'" *Id.* (internal quotation and citations omitted).

A significant decision for purposes of the case at hand is *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). North Carolina had responded to *Furman* by requiring the death penalty upon conviction for certain crimes, thus eliminating jury discretion altogether. The Supreme Court found the statute unconstitutional for several distinct reasons, one of which is worth quoting at length here:

> A third constitutional shortcoming of the North Carolina statute is its failure to allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death. In *Furman,* members of the Court acknowledge what cannot fairly be denied that death is a punishment different from all other sanctions

---

9. *See Robinson v. California,* 370 U.S. 660, 666, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

in kind rather than degree. *See* 408 U.S. at 286—291, 92 S.Ct. at 2750—2753 (Brennan, J., concurring); *Id.,* at 306, 92 S.Ct. at 2760 (Stewart, J., concurring). A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death.

This Court has previously recognized that "[f]or the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender." *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55, 58 S.Ct. 59, 61, 82 L.Ed. 43 (1937). Consideration of both the offender and the offense in order to arrive at a just and appropriate sentence has been viewed as a progressive and humanizing development. *See Williams v. New York*, 337 U.S. at 247—249, 69 S.Ct. at 1083—1084; *Furman v. Georgia*, 408 U.S. at 402—403, 92 S.Ct. at 2810—2811 (Burger, C. J., dissenting). While the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative, we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment, see *Trop v. Dulles*, 356 U.S. at 100, 78 S.Ct. at 597 (plurality opinion), requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.

This conclusion rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100–year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

*Id.* at 303—05, 92 S.Ct. 2726.

Two years later, the Supreme Court held that the Eighth and Fourteenth Amendments require that the sentencer in a capital case must be permitted to consider as a mitigating factor *any* aspect of the defendant's character, record or the circumstances of the crime. *Lockett,* 438 U.S. at 604, 98 S.Ct. 2954. As Justice O'Connor pointed out in a later decision, information about the defendant's background and character is relevant "because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *California v. Brown,* 479 U.S. 538, 545, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (O'Connor, J., concurring).

In contrast to the carefully defined standards that must narrow a sentencer's discretion to *impose* the death sentence, the Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to *decline to impose* the death sentence. [citations omitted] Indeed, it is

precisely because the punishment should be directly related to the personal culpability of the defendant that the jury must be allowed to consider and give effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense. Rather than creating the risk of an unguided emotional response, full consideration of evidence that mitigates against the death penalty is essential if the jury is to give a reasoned *moral* response to the defendant's background, character, and crime. [citations and quotations omitted] In order to ensure reliability in the determination that death is the appropriate punishment in a specific case, [citation and quotation omitted], the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime.

*Penry v. Lynaugh*, 492 U.S. 302, 327—28, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (emphasis in original). The breadth of consideration given to mitigating factors is also essential so that jurors can "dispense mercy of the basis of factors too intangible to write into a statute." *Id.* at 327, 109 S.Ct. 2934 (internal citation omitted).

In 1982, the Supreme Court ruled that "[j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law,* any relevant mitigating evidence." *Eddings v. Oklahoma*, 455 U.S. 104, 113—14, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (emphasis in original); *see also Sumner v. Shuman*, 483 U.S. 66, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987) (striking down mandatory death penalty for prison inmate convicted of murder while serving a life sentence without possibility of parole). Six years later, the Supreme Court reaffirmed the necessity of having the sentencer consider *all* mitigation, and noted that "[u]nder our

decisions, it is not relevant whether the barrier to the sentencer's consideration of all mitigating evidence is interposed by statute; by the sentencing court; or by evidentiary ruling." *Mills v. Maryland*, 486 U.S. 367, 375, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) (internal citations omitted).

In this case, Davis has persisted in his intention that the jury not have the benefit of any mitigating evidence in the penalty phase of his case. Most recently, he has declared that he wants nothing done at the penalty phase on his behalf at all. To permit Davis to withhold from the jury relevant mitigation undermines the integrity of the judicial process, defeats the reliability of the outcome and subverts our adversary system of justice. Davis in effect is appropriating to himself a judgment that only society, through the jury in this case, can properly make.

While it is unusual for a person convicted of first degree murder to wish to represent himself or, even if represented, withhold mitigation evidence, such has happened and has been met with a variety of judicial responses. Some courts have categorically concluded that such a right falls within the *Faretta* right of self-representation. Other courts have concluded, as has this one, that such a right either does not exist at the penalty phase of a death case or, if it does, it is outweighed by the Eighth Amendment requirement that the death penalty not be imposed arbitrarily and capriciously.

In Florida, state law provides for an advisory jury in death cases, with the trial judge making the final determination after taking the jury recommendation into consideration. While the jury is advisory, it is nonetheless required by statute to consider aggravating and mitigating factors and to base its recommendation specifically on

the circumstances of the crime and the character and background of the defendant. *See* Fla. Stat. Ann. § 921.141(2) (1995); *Herring v. State,* 446 So.2d 1049, 1056 (Fla.), *cert. denied,* 469 U.S. 989, 105 S.Ct. 396, 83 L.Ed.2d 330 (1984), *receded from on other grounds, Rogers v. State,* 511 So.2d 526, 534 (Fla.1987).

Within the last year, the Florida Supreme Court dealt with a conviction and death sentence where the defendant had discharged his counsel prior to the penalty phase and then presented no mitigation evidence to the advisory jury. *See Muhammad v. State,* 782 So.2d 343 (Fla. 2001).[10] The jury recommended death. The judge had the benefit of a presentence report, which included mitigation evidence not presented to the jury. He considered that evidence, but nonetheless gave "great weight" to the jury recommendation and imposed the death sentence. *Id.* at 361. The Florida Supreme Court reversed, finding that the trial court erred first in giving weight to the recommendation because the jury had heard no mitigation evidence, and further in failing "to provide for an alternative means for the jury to be advised of available mitigating evidence." *Id.* The Court offered the following solution in future penalty phase hearings:

> Having continued to struggle with how to ensure reliability, fairness, and uniformity in the imposition of the death penalty in these rare cases where the defendant waives mitigation, we have now concluded that the better policy will be to require the preparation of a PSI in every case where the defendant is not challenging the imposition of the death penalty and refuses to present mitigation evidence. To be meaningful, the PSI should be comprehensive and should include information such as previous mental health problems (including hospitalizations), school records, and relevant family background. In addition, the trial court could require the State to place in the record all evidence in its possession of a mitigating nature such as school records, military records, and medical records. Further, if the PSI and the accompanying records alert the trial court to the probability of significant mitigation, the trial court has the discretion to call persons with mitigating evidence as its own witnesses.... If the trial court prefers that counsel present mitigation rather than calling its own witnesses, the trial court possesses the discretion to appoint counsel to present the mitigation or to utilize standby counsel for this limited purpose.

782 So.2d 343, 363 (footnotes and citations omitted).

It is noteworthy that the above procedures were considered necessary or advisable even though the jury recommendation in Florida is merely that—a nonbinding recommendation to the judge. The federal procedures, of course, grant to the jury the final decision. All the more reason, therefore, that the jury have access to all possible mitigation evidence.

In *Klokoc v. State,* 589 So.2d 219 (Fla. 1991), the defendant pled guilty to first degree murder, waived the advisory jury and refused to permit his counsel to present any mitigation evidence to the judge. The trial court denied counsel's attempt to withdraw but appointed "special counsel to represent the public interest in bringing forth mitigating factors to be considered by the court in the sentencing proceeding." *Id.* at 220. *See also Hamblen v. State,* 527

---

**10.** Also reported at 782 So.2d 343, 26 Fla. L. Weekly S37, 26 Fla. L. Weekly S156, and 782 So.2d 343, 26 Fla. L. Weekly S224.

So.2d 800, 809 (Fla.1988) (Barkett, J., dissenting).

In a New Jersey case, *State v. Hightower*, 214 N.J.Super. 43, 518 A.2d 482 (1986), the defendant was convicted of capital murder and then instructed his attorneys not to contest the death penalty, even though mitigation witnesses were available. The trial court decided that the defendant's wishes should prevail. Defense counsel appealed immediately and the appellate court reversed. The appeals court acknowledged the legal legitimacy of the defendant's wishes but found the "constitutional necessity" of assuring that the death penalty not be imposed in a "wanton and freakish manner" to be more compelling. *Id.* at 483 (quoting *Furman*, 408 U.S. at 309—10, 92 S.Ct. 2726). "[T]he jury must at least listen to any relevant evidence on mitigation which his manifestly competent defense counsel here chooses to offer." *Id.; see also People v. Silagy*, 101 Ill.2d 147, 77 Ill.Dec. 792, 461 N.E.2d 415, 435—38 (1984) (Simon, J., dissenting). In *State v. Koedatich*, 112 N.J. 225, 548 A.2d 939 (1988), the defendant was convicted and, as in *Hightower*, instructed his attorney to do absolutely nothing in the penalty phase. Defense counsel complied and the defendant was sentenced to death. The New Jersey Supreme Court reversed, finding that the state's interest in a reliable penalty determination trumps a defendant's right to waive the presentation of mitigating evidence. *Id.* at 993. "It is self-evident that the state and its citizens have an overwhelming interest in insuring that there is no mistake in the imposition of the death penalty." *Id.* at 995. *See also State v. Koedatich*, 98 N.J. 553, 489 A.2d 659 (1984).

In a Georgia case, *Morrison v. State*, 258 Ga. 683, 373 S.E.2d 506 (1988), defense counsel not only complied with his client's instructions to present no evidence at the penalty phase, but also affirmatively argued in favor of the death penalty before the sentencing judge because that was what his client professed to want. At the sentencing hearing, however, the judge explored the defendant's background and looked for mitigation by calling as the court's witness a witness that had been subpoenaed by the defense, and questioned two psychiatrists who had evaluated the defendant. *Id.* at 509. He also reviewed the defendant's parole file which included other psychological evaluations.[11] *Id.*

The California Supreme Court has dealt with the issue extensively, with varying results. In *People v. Deere*, 41 Cal.3d 353, 222 Cal.Rptr. 13, 710 P.2d 925 (1985), the defendant pled guilty to capital murder, offered no mitigating evidence, expressed remorse but said he deserved to die. Counsel acquiesced in this conduct, based on his client's wishes. The defendant was sentenced to death. The Court reversed for a variety of considerations. To allow such a procedure to stand would be using the judicial system to commit state-aided suicide; it would prevent the higher court from discharging its obligation to review the propriety of the death sentence upon a complete record, *id.* at 930; and the reliability of the sentence would be undermined, *id.* at 931.

To allow a capital defendant to prevent the introduction of mitigating evidence on his behalf withholds from the trier of fact potentially crucial information bearing on the penalty decision no less than if the defendant was himself prevented from introducing such evidence by stat-

---

11. *See also Thompson v. Wainwright*, 787 F.2d 1447 (11th Cir.1986) and *Blanco v. Singletary*, 943 F.2d 1477 (11th Cir.1991) (concerning defense counsel's obligation to investigate mitigation evidence despite being directed by their client not to do so).

ute or judicial ruling. In either case the state's interest in a reliable penalty determination is defeated.

*Id.* The high court also concluded that counsel had a duty as an officer of the court to assure that all relevant information was made available to the sentencer. *Id.* at 933 n. 5 (noting that defense counsel "is also an officer of the court with a duty to assure that the court has all relevant information to be able to perform its mandatory consideration of mitigating circumstances").[12]

In *People v. Bloom*, 48 Cal.3d 1194, 259 Cal.Rptr. 669, 774 P.2d 698 (1989), the California high court reversed itself. The defendant was convicted of capital murder and was granted the right to represent himself at the penalty phase, even though he intended to seek the death penalty. No mitigation was presented. His counsel and the trial judge tried to persuade him to allow a defense but the defendant refused. He received the death penalty. The high court found no error, and in particular concluded that once the defendant was properly allowed to represent himself, his attorney had no further obligations.[13] *Id.* at 718.

This Court finds flaws in the reasoning of *Bloom*, as well as the other cases upholding death verdicts obtained this way.[14] The court in *Bloom*, for example, stated

that if the trier of penalty has determined death to be appropriate, and the judgment meets "constitutional standards of reliability," then it cannot be considered the defendant's doing, nor the "execution as suicide." *Id.* at 715—16. But this statement merely begs the question. In this Court's view, a sentence of death resulting from a penalty phase conducted without benefit of available mitigating evidence does not meet "constitutional standards of reliability." Reliability requires meaningful adversarial testing and a full airing of the relevant facts, mitigation as well as aggravation. The *Bloom* court also concluded that requiring a defendant to put on mitigation would be unenforceable, as the defendant could refuse to cooperate. Granted, the defendant himself could withhold some mitigation evidence by not cooperating, but he could not independently prevent counsel from gathering evidence from other sources. Indeed, even in this case, all Davis can surely control is the information he gives. Whether his family or friends decide to assist, with or without his acquiescence, is their decision to make. In addition, counsel has been free to develop mitigation evidence from other sources.

"The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective" *Bloom,*

---

**12.** *Cf. United States v. Rodriguez*, 556 F.2d 638, 642 (2d Cir.1977) ("Defendant's counsel has obligations to both the court and the client. As an advocate at the bar, he never ceases to be an officer of the court when serving as a lawyer for a litigant."); *State v. Tiznado*, 23 Ariz.App. 483, 534 P.2d 291, 293 (1975) ("This court cannot help but comment that there is something wrong with a system which allows the defense attorney to stand idly by and permit the trial court to fall into error .... Defense counsel is an officer of the court and has a duty ... to see that the requirements of the Rules of Criminal Procedure are complied with.").

**13.** The California Supreme Court has maintained this position consistently ever since, over the at times spirited dissent by Justice Mosk, author of the *Deere* decision. *See, e.g., People v. Bradford*, 15 Cal.4th 1229, 65 Cal. Rptr.2d 145, 939 P.2d 259 (1997); *People v. Clark*, 3 Cal.4th 41, 10 Cal.Rptr.2d 554, 833 P.2d 561 (1992); *People v. Clark*, 50 Cal.3d 583, 268 Cal.Rptr. 399, 789 P.2d 127 (1990).

**14.** *See, e.g., Silagy, supra; Bishop v. State*, 95 Nev. 511, 597 P.2d 273 (1979); *Smith v. State*, 686 N.E.2d 1264 (Ind.1997); *see also* Richard J. Bonnie, *The Dignity of the Condemned*, 74 *Va. L.Rev.* 1363 (1988).

259 Cal.Rptr. 669, 774 P.2d at 724 (Cal. 1989) (Mosk, J., dissenting from affirmance of judgment imposing death penalty) (citing *Herring v. New York*, 422 U.S. 853, 862, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975)). Our law decrees that whether or not a defendant receive the death penalty is to be decided by an independent review of aggravating and mitigating factors, and not by the defendant, and neither should that "constitutional obligation ... be thwarted by the defendant's own actions or inactions." *Muhammad*, 782 So.2d 343, 368–69.[15] The death penalty may not be imposed by default.

This Court has a responsibility to assure that punishment is imposed in this case upon a procedurally clean record which meets the required standard of reliability. The greatest guarantee that these constitutional standards will be met is if counsel is given the full authority to develop and present the penalty defense they consider the most persuasive and appropriate.[16]

Therefore, in light of the foregoing analysis, IT IS ORDERED that the Government's Motion is GRANTED to the extent that counsel for Davis are instructed to determine, prepare and present his defense at the sentencing proceedings. IT IS FURTHER ORDERED that the Government's Motion for a Mental Status Examination is hereby DENIED AS MOOT.

---

**15.** *See also* Eric Rieder, *The Right of Self-Representation in the Capital Case,* 85 *Colum. L.Rev.* 130 (1985).

**16.** In Davis' most recent *pro se* filing, he himself acknowledges the singular importance of legal representation, while chastisizing the prosecutor for objecting to hybrid representation:

> [I]t does seem to me that if I had the awesome responsibility of seeking someone's death, and I was armed with all the power of the federal government, the last thing I would want to do would be to diminish the meager resources of the defendant. To the contrary, if the day ever came that he was executed I do not think I could live with myself if I knew I had been responsible for depriving him of any assistance that might have aided him in fighting for his life.

Rec. Doc. 905.