UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 01-30656
_____


UNITED STATES OF AMERICA,

Plaintiff - Appellee

VERSUS

LEN DAVIS,

Defendant - Appellant


Petition for Writ of Mandamus to the United States
District Court for the Eastern District of Louisiana


March 11, 2002

Before DeMOSS, PARKER, and DENNIS, Circuit Judges.

ROBERT M. PARKER, Circuit Judge:

The Defendant-Petitioner, Len Davis ("Davis"), has filed a motion for clarification of this Court's previous writ of mandamus, or, alternatively, for the issuance of a second writ of mandamus overturning the district court's decision to appoint an independent counsel to represent the public interest in the penalty phase proceeding of this capital case. For the following reasons, we

1

issue the writ.

## I.   FACTS AND PROCEDURAL HISTORY

Davis was convicted of civil rights murder in violation of 18 U.S.C. §§ 241 and 242, and sentenced to death.  On appeal, we upheld the conviction but reversed the death sentence and remanded for a new penalty trial.  *United States v. Causey*, 185 F.3d 407 (5th Cir. 1999).  Upon remand, the district court appointed counsel to represent Davis.  Davis announced to the court that he desired to represent himself during the penalty trial.  He also took the position that he does not want to present traditional mitigating evidence during the penalty trial, but will focus instead on attacking the strength of the government's case as to guilt.

After holding a hearing pursuant to *Faretta v. California*, 422 U.S. 806 (1975), the district court found that Davis's decision to represent himself was made knowingly and intelligently. However, the district court concluded that the *Faretta* right to self-representation does not extend to criminal sentencing, and even if it does, Davis's interests are outweighed by the Eighth Amendment requirement that the death penalty not be imposed arbitrarily and capriciously.  Thus, the district court precluded Davis from representing himself and ordered standby counsel to assume full representation and prepare a full penalty phase defense.  Davis sought a writ of mandamus in this Court compelling the district court to permit self-representation instead.

2

On July 17, 2001, this Court issued a writ of mandamus directing the district court to allow Davis to represent himself in the penalty phase of this capital case. We determined that Mr. Davis has a Sixth Amendment right to represent himself during the penalty trial as specified by the United States Supreme Court in *Faretta*, but we gave the district court the authority to appoint standby counsel. The case was then remanded back to the district court.

On August 30, 2001, the district court issued an order appointing Laurie White to serve as an independent counsel at the penalty phase of this case. According to the order, the independent counsel is to represent the "interest of the public" in having a full and fair penalty phase proceeding. This means that the independent counsel will present traditional mitigating factors in favor of Davis to the jury at the penalty trial.

On October 9, 2001, Davis moved the Court to clarify the July 17, 2001 mandamus order, or alternatively, to issue a second writ of mandamus to the district court overturning the appointment of an independent counsel. In the motion, Petitioner contends that the district court's appointment of an independent counsel "completely eviscerates his *Faretta* right to represent himself pro se." We agree. Therefore, we issue this second writ of mandamus.

## II. DISCUSSION

### A. The District Court's Rationale

3

In its Order and Reasons, the district court decided that the appointment of an independent counsel does not conflict with Davis's right to represent himself because Davis would still be allowed to present any evidence he desires. The district court stated that it would allow "Davis full rein in his penalty phase. He may voir dire jurors, make opening statements, question witnesses, call witnesses, introduce evidence, make objections and present a closing argument, all he desires to do or not do, within the appropriate procedural and evidentiary rules." However, the court found that allowing Davis "full rein" did not mean that he could silence "other potential voices in the courtroom" from presenting evidence they deemed to be helpful to the jury.

The district court justified its determination that Davis's *Faretta* rights are not undermined by the appointment of an independent counsel by opining that both the government and the trial judge play a role in the penalty trial that is similar to the role an independent counsel could play. The district court noted that (1) the government has an obligation to produce mitigating as well as exculpatory evidence to the fact finder if that serves the ends of justice; and (2) the trial judge may interpose questions to witnesses to elicit evidence that might otherwise not be presented. The district court reasoned that:

> An independent counsel, clearly identified as not associated with Davis, could likewise present evidence and question witnesses, providing relevant information helpful to the

4

jury's decision. Just as the government's obligation to disclose mitigation evidence and the Court's prerogative to question witnesses do not interfere with Davis's *Faretta* right, neither would the participation of this independent counsel.

## B. The Sixth Amendment Violation

We find that the district court's decision to appoint an independent counsel violates Davis's Sixth Amendment right to self-representation. An individual's constitutional right to represent himself is one of great weight and considerable importance in our criminal justice system. This right certainly outweighs an individual judge's limited discretion to appoint amicus counsel when that appointment will yield a presentation to the jury that directly contradicts the approach undertaken by the defendant.[1]

## 1. Proper Role of the Trial Court

At the outset, we note that the district court has misconstrued its proper role in conducting the penalty trial by overstating the parameters within which a judge can question witnesses. Rule 614(b) of the Federal Rules of Evidence permits judges to question witnesses. A trial judge's questioning of witnesses is permissible if aimed at clarifying the evidence or

---

[1] The district court envisions that the conflict between the independent counsel's presentation and Davis's trial strategy will be ameliorated by instructing the jury that the independent counsel does not represent Davis, but rather her participation is required "by law." In our view, this instruction actually compounds the problem as it gives the independent counsel's presentation an aura of superiority over whatever is presented by the prosecution and the defense.

5

managing the trial. *United States v. Williams*, 809 F.2d 1072, 1087 (5th Cir. 1987).

A judge's questioning, however, should never evince or appear to evince partiality to one side over the other. *See U.S. v. Reyes*, 227 F.3d 263, 265 (5th Cir. 2000) ("[t]he primary limitation on this judicial investigatory power is that it must be undertaken for the purposes of benefitting the jury in its understanding of the evidence, and the court may not appear to be partial"); *U.S. v. Martin*, 189 F.3d 547, 553 (7th Cir. 1999)("a judge's discretion to question witnesses is not unfettered. A judge cannot assume the role of an advocate for either side."); *United States v. Tilghman*, 134 F.3d 414, 416 (D.C. Cir. 1998)(noting that trial judges must strive to preserve an appearance of impartiality and must err on the side of abstention from intervention). For example, a judge should not ask questions which indicate his belief or disbelief of witnesses. *United States v. Wyatt*, 442 F.2d 858, 859-61 (D.C. Cir. 1971).

In our July 17, 2001 opinion, we noted that the district court may interpose questions to witnesses during the penalty trial. The district court construed this statement as an invitation "to elicit evidence that might otherwise not be presented." The district court further implied that it has the right to elicit evidence from witnesses in a manner similar to that of an independent counsel.

We disagree with the district court's understanding of our

previous statement. The district court shall not interpose questions to witnesses during the penalty trial which demonstrate partiality to one side or one position. The district court's role in the penalty trial shall be one of judge, not advocate.

## 2. Absence of Statutory Authority or Case Law Authority

The district court provides no federal statutory authority for appointing an independent counsel to present mitigation evidence in the penalty phase of a capital case. Instead, the district court relied upon civil cases in which federal courts permitted amicus curiae to assist in the proceedings. We closely scrutinized the "amicus curiae" cases. None are remotely analogous to the situation in the instant case. Therefore, we deem these cases to be of limited precedential value.

In the reverse but analogous scenario, the federal courts have also addressed whether district judges have the power to appoint special prosecutors when the government elects not to prosecute. In *Nathan v. Smith*, 737 F.2d 1069 (D.C. Cir. 1984), the D.C. Circuit considered whether a district court had the authority to order the Attorney General of the United States to conduct a preliminary investigation pursuant to 28 U.S.C. § 592 of the Ethics in Government Act. The only purpose of the preliminary investigation was to enable a report to be made to the court concerning the need or lack thereof for the appointment of an independent counsel. The D.C. Circuit reversed the district court order which started the

7

special prosecutor appointment process. *Id.*

In the *Matter of An Application for Appointment of Independent Counsel*, 596 F. Supp. 1465 (E.D. N.Y. 1984), the district court determined that it had no authority to appoint independent counsel to prosecute a government informer for giving false evidence and false statements. In *Application*, the Department of Justice had declined to indict the government informer. The applicants, however, argued that the court had the inherent power to appoint a special prosecutor. Judge Glasser rejected this contention for several reasons.

First, Judge Glasser noted that the judges in the Watergate cases of *O'Brien v. The Finance Committee to Re-Elect the President*, *et al.*, Civ. No. 1233-72 (D.D.C. Sept. 25, 1972) and *United States v. Liddy*, Crim. No. 1827-72 (D.D.C. November 21, 1972) found no basis for the judicial appointment of special prosecutors. *Id.* at 1469. Second, he determined that no federal statute provided for judicial appointment of a special prosecutor or independent counsel under the circumstances of the case. *Id.* at 1470. Third, he expounded upon the separation of powers problems that would arise from judicial appointment of special prosecutors.[2]

_____

[2] Judge Glasser's memorandum opinion and order were later vacated because the Second Circuit determined that the applicants did not have standing to apply for appointment of independent counsel. *See Appointment of Independent Counsel*, 766 F.2d 70, 77 (2nd Cir. 1985). Nevertheless, the rationale in the district court's opinion is persuasive.

8

*Id.* at 1470-71.

In this Circuit, we have not specifically addressed the judiciary's alleged inherent power to appoint special prosecutors.[3] However, in *United States v. Cox*, 342 F.2d 167, 172 (5th Cir. 1965), *cert. denied*, 381 U.S. 935 (1965) (per curiam), we held that a district court lacked the power to require the United States Attorney to sign indictments, and thereby dispelled the notion that the district court had the power to compel the executive branch to initiate prosecution.[4]

We grounded the *Cox* holding on separation of powers concerns. *Id.* at 171 ("It follows, as an incident of the constitutional separation of powers, that the courts are not to interfere with the free exercise of the discretionary powers of the attorneys of the

---

[3] In *United States v. Cowan*, 524 F.2d 504 (5th Cir. 1975), we considered a case in which a federal district court judge refused to grant an agreed dismissal of a prosecution and appointed private special prosecutors to continue prosecution of the action. As in the case at bar, the district judge justified his decision to appoint special prosecutors on the judiciary's inherent power to protect the public interest. *Id.* at 507. Because we determined that the district judge abused his discretion under Federal Rule of Criminal Procedure 48(a) by denying the government's motion to dismiss the indictment against the defendant, we did not address the propriety of the district court judge's decision to effectuate the denial by appointing special prosecutors. *Id.* at 514.

[4] In *Cox*, the grand jury asked the United States attorney to draft and sign true bills of indictment against certain individuals. The United States attorney, acting on instructions from the Attorney General, refused. The district court ordered the United States attorney to draft and sign such instruments. The United States attorney refused once again. The district court held the attorney in civil contempt. *Id.* at 169, 170.

9

United States in their control over criminal prosecutions."). In our view, allowing federal judges to appoint special prosecutors when the government elects not to prosecute would contravene the *Cox* holding. Therefore, we find it highly unlikely that this Circuit would allow such appointments.

As we have previously stated, the special prosecutor cases are not directly analogous to the instant case, but they remain instructive. In both instances, the district court judge based the decision to appoint a special prosecutor or independent counsel on an alleged inherent judicial power, not statutory authority. There is little distinction between special prosecutors and special (independent) counsel appointed to present evidence calculated to aid the defense. Therefore, the exacting appellate scrutiny applied to judicial appointment of special prosecutors must also be applied to the instant case.

The judiciary's alleged "inherent power" to appoint special prosecutors clashes with Article II, section 3 of the United States Constitution.[5] Similarly, the district court's alleged inherent authority to appoint independent counsel clashes with the petitioner's Sixth Amendment *Faretta* rights. In both situations, the Constitution prevails over any "inherent judicial power"

---

[5] Article II, section 3 deposits the law enforcement power in the President by providing that he "shall take Care that the Laws be faithfully executed." No power to enforce the laws is vested in the judiciary by Article III.

10

argument.

### 3. The Strength and Nature of the Self-Representation Right

The district court's analysis also misses the mark because it fails to take into consideration the strength and nature of the right of self-representation. In *Faretta*, the Supreme Court expounded upon the history at the time of the passage of the Sixth Amendment which underpinned its decision to imply from the text the right of self-representation. The Supreme Court explained that all historical evidence led to the conclusion that the right of self-representation was at the very heart of the Sixth Amendment. *Faretta*, 422 U.S. at 832. Indeed, the Framers "always conceived of the right to counsel as an 'assistance' for the accused, to be used at his option, in defending himself." *Id.*

The district judge appointed the independent counsel because she wants the jury to have a complete picture of all possible traditional mitigating factors. In her view, society's interest in a full and fair capital sentencing proceeding can only be served if all possible aggravating and mitigating factors are presented to the jury. While this notion is certainly noble, it cannot be squared with Davis's self-representation right. *Faretta* teaches us that the right to self-representation is a personal right. It cannot be impinged upon merely because society, or a judge, may have a difference of opinion with the accused as to what type of evidence, if any, should be presented in a penalty trial.

11

> The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.'" *Id.* at 834 (quoting *Illinois v. Allen*, 397 U.S. 337, 350-51 (1970) (Brennan, J., concurring)).

Davis has indicated that he intends to employ an admittedly risky strategy during the penalty phase. Instead of presenting traditional mitigating evidence, he intends to attack the strength of the government's case as to his guilt.[6] This is a specific tactical decision.[7] Davis has made it quite clear that he does not

---

[6] There is evidence in the record that Davis has, on various occasions, threatened that he will not present any evidence during the penalty trial. However, based upon his brief, it appears as though Davis will be utilizing his "residual doubt" argument during the penalty trial. There is also evidence in the record to indicate that Davis would prefer the death penalty to be imposed at the sentencing stage. Davis reasons that if he receives the death penalty his legal arguments concerning sufficiency of the evidence will be scrutinized more closely on appeal. His conviction will then have a greater likelihood of being reversed. Although the district court has determined that Davis's actions demonstrate that he invites the death penalty, Davis has consistently maintained that he is not on a suicide mission. Whatever the merits of Davis's legal strategy, we find that Davis has the right to conduct his penalty defense in the manner of his choosing "for it is he who suffers the consequences if the defense fails." *Faretta*, 422 U.S. at 820. Therefore, if he so chooses, Davis has the constitutional right to implement his legal strategy by arguing to the jury that he should receive the death penalty.

[7] The district court has found that "residual doubt" as to guilt is a legitimate mitigating factor appropriately argued during the penalty phase of a capital case. The issue of residual doubt

12

want any traditional mitigating evidence to be presented on his behalf. Nevertheless, the district court has appointed the independent counsel specifically for the purpose of presenting a full penalty phase defense which will utilize traditional mitigating factors. As such, Davis's strategy is in direct conflict with the independent counsel's approach. Because Davis's right to self-representation encompasses the right to direct trial strategy, the district court's decision to impose an independent counsel into these proceedings is overturned.[8]

## III. CONCLUSION

The core of a defendant's right to pro se representation is his ability to preserve actual control over the case he chooses to present to the jury. *McKaskle v. Wiggins*, 465 U.S. 168, 178 (1984). This is so regardless of whether society would benefit from having a different presentation of the evidence. Because Davis will be stripped of his right to preserve actual control over his penalty trial defense if the appointment of the independent

is not before us in this appeal and we express no view regarding the correctness of the district court's ruling regarding residual doubt qualifying as a legitimate mitigating factor for the jury to consider in assessing punishment.

[8] Nothing in this opinion should be construed by Davis as any indication that we think his defense strategy is a winning one. Indeed, it may be foolhardy. However, our task is not to cast judgment upon the wisdom of Davis's strategy. Our task is simply to make sure that, as long as he has voluntarily and intelligently chosen to represent himself, he is given the opportunity to employ his own strategy, whatever it may be, without interference from an independent counsel acting at the behest of the judiciary.

13

counsel is allowed to stand, we conclude that Davis has a clear and indisputable right to mandamus relief and no adequate alternative to mandamus exists. *In re: American Airlines, Inc.*, 972 F.2d 605, 608 (5th Cir. 1992), *cert. denied sub. nom. Northwest Airlines, Inc. v. American Airlines, Inc.*, 507 U.S. 912 (1993). We therefore grant the petition.

We reiterate that the district court may appoint standby counsel for Davis if appropriate. However, during the penalty trial, the district court shall not allow standby counsel to interfere with Davis's self-representation right. Any attempt by standby counsel to present traditional mitigating evidence (against the wishes of Davis) would also violate Davis's *Faretta* right and this writ. *See Myers v. Johnson,* 76 F.3d 1330, 1334 (5th Cir. 1996)(quoting from *McKaskle v. Wiggins*, 465 U.S. at 178) ("If standby counsel's participation over the defendant's objection effectively allows counsel to make or substantially interfere with any significant tactical decision . . . the *Faretta* right is eroded.").

Petition GRANTED, writ ISSUED, and action REMANDED for a sentencing proceeding without the assistance of the appointed independent counsel.

14

JAMES L. DENNIS, Circuit Judge, dissenting:

The ultimate issue is whether a convicted federal capital murder defendant has the absolute right to choose death as his penalty and thus turn his sentencing hearing under the Federal Death Penalty Act of 1994 ("FDPA")[9] into a charade. The majority misinterprets the record and ignores the district court's fully supported findings of fact, which show that Davis intends to incur the death penalty by presenting no adversary trial defense whatsoever.[10] The majority errs grievously in

---

[9]*See* 18 U.S.C. §§ 3591–3598.

[10]The majority closes its eyes to the fact that Davis has no adversary trial strategy, that he only claims, instead, to have a post-conviction strategy, and, most important, that he is actively seeking a death sentence rather than a life sentence. *See infra* notes 14–15. Crediting Davis's assertion that he is not on a "suicide mission," the majority states that "it appears as though Davis will be utilizing his 'residual doubt' argument during the penalty trial," Maj. Op. at 12 n.6, in an effort "to attack the strength of the government's case as to his guilt." *Id.* at 12. But Davis's own words reveal that his sole motivation is to receive the death penalty, and he has gone so far as to threaten to do nothing at the sentencing trial in order to realize this goal. At a July 26, 2001 hearing, the district court indicated, for the first time, its intention to appoint amicus counsel for the purpose of developing and presenting mitigating evidence. Davis issued the following ultimatum in response:

> [I]f this case doesn't go forward on August the 13th [, 2001], . . . I am coming in this courtroom and there will be no residual doubt argument, there will be no cross-examination, there will be no opening and closing statements, and I have already made it clear that I'm wearing just what I'm wearing [(a prison jumpsuit)].
>
> . . . I'll come in this courtroom, sit down with no problems, and will do absolutely nothing if this case doesn't go forward August the 13th.

Furthermore, even if the majority's statement that Davis is not on a "suicide mission" is correct, his ironic belief that a death sentence might ultimately save his life is irrelevant. As the amicus response correctly states, "Both parties in this case seek the same outcome from the district court—a sentence of death. . . . Petitioner's decision to actively seek a death verdict at the trial level causes the adversary system to disintegrate. Neither party will be asking the jury to consider a sentence of life." Response of National Association of Criminal Defense Lawyers as Amicus Curiae Supporting Affirmance of the District Court's Appointment of Independent Counsel at 2, 8–9. "For this reason, it makes no difference *why* Mr. Davis joins the government in seeking a death verdict. All that matters is that there is no one asking the jury to consider life." *Id.* at 9 n.3 (emphasis in original).

-15-

interpreting the Supreme Court's cases as holding that a criminal defendant's right of self-representation is absolute and that the trial court is therefore powerless to exercise any significant supervision or regulation of the defendant's use of that right. I respectfully but emphatically dissent.

## III. OVERVIEW

The majority commits legal error, in this case of first impression, by holding that a federal defendant convicted of capital murder may, prior to a sentencing hearing conducted under the FDPA, waive his right to counsel and assert his right to self-representation for the purpose of incurring the death penalty by presenting no defense at the sentencing hearing.[11] The majority conceives a criminal defendant's right to self-representation to be an insuperable right that is not diminished by the dramatic change in the defendant's autonomy interest resulting from his criminal conviction; an impregnable right that so outweighs the national interest in fairness, accuracy, and equality in federal capital sentencing proceedings that it permits of no significant regulation or supplementation by the trial courts; and a right that is so perfect and untrammeled that the convicted capital offender may, within his complete discretion, use it either to make a defense or to condemn himself to death.

But the majority's concept differs sharply from the right to self-representation expounded by

_____

[11]The majority adheres to the same errors that affected its other post-remand rulings in this case. In dissenting from this court's July 17, 2001 order granting mandamus and directing the district court to permit Len Davis to represent himself in the sentencing phase of this capital case despite his announced intention to seek the death penalty, I explained that both Davis and the majority misinterpreted the Supreme Court's decision in *Faretta v. California*, 422 U.S. 806 (1975). On August 3, 2001, the same divided panel of this court denied the motion of Paul Hardy, Davis's convicted co-defendant, for leave to intervene for the purpose of filing a petition for panel rehearing, or, alternatively, requesting the appointment of amicus curiae to file a petition for panel rehearing, and/or suggesting rehearing *en banc*. I dissented from the August 3 order and suggested that the appointment of an amicus curiae was the proper remedy for the breakdown in the adversary system that resulted when Davis and the government joined forces to advocate for the death penalty. Because my colleagues again use the extraordinary writ of mandamus to vacate a district court decision that is not clearly and indisputably wrong, I dissent for a third time.

the Supreme Court. The Court explained in *Faretta* that "[t]he Sixth Amendment includes a compact statement of the rights necessary to a full defense" and that the right of self-representation is merely one of the constituent rights.[12] It is not an absolute, free-standing right that can run counter to its source, the Sixth Amendment right to make a defense. The Court made this very clear when it said: "The rights to notice, confrontation, and compulsory process, when taken together, guarantee that a criminal charge may be answered in a manner now considered fundamental to the fair administration of American justice—through the calling and interrogation of favorable witnesses, the cross-examination of adverse witnesses, and the orderly introduction of evidence. In short, the Amendment constitutionalizes the right in an adversary criminal trial to make a defense as we know it. . . . Although not stated in the Amendment in so many words, the right to self-representation—to make one's own defense personally—is thus necessarily implied by the structure of the Amendment."[13] In no way did the Court, in *Faretta* or any other case, ever suggest that self-representation can be separated from the right to make a defense and used negatively to eviscerate the basic Sixth Amendment right to resist the prosecution's attack, as the majority presently holds.

Because the right of self-representation is implied by and inherently part of the Sixth Amendment right to make a defense, the Supreme Court has recognized many exceptions and qualifications to the exercise of self-representation that enable trial courts to prevent it from being used to harm or defeat the basic right to make a defense. For example, the Court pointed out in

---

[12]*Faretta*, 422 U.S. at 818.

[13]*Id.* at 818–19. *See Martinez v. Court of Appeal of California*, 528 U.S. 152, 154 (2000) ("Our conclusion in *Faretta* extended only to a defendant's 'constitutional right to conduct his own defense.' Accordingly, our specific holding was confined to the right to defend oneself at trial.") (citation omitted). *See also United States v. Nixon*, 418 U.S. 683, 709 (1974) ("The need to develop all relevant facts in the adversary system is both fundamental and comprehensive.").

*Faretta* that even when the defendant seeks to use the right of self-representation for the proper purpose of making a defense, the trial court must first determine that the defendant's waiver of the assistance of counsel is knowing and intelligent and that the defendant is aware of the dangers and disadvantages of self-representation.[14] And "the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct."[15] The trial court "may—even over objection by the accused—appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary."[16] Moreover, contrary to the majority's holding in the present case, *Faretta* left open the trial court's option of mitigating some of the problems resulting from self-representation by "appointing a qualified lawyer to sit in the case as the traditional 'friend of the court.'"[17]

More recently, the Court affirmatively recognized the amicus counsel option and observed other limitations on the right to self-representation in *McKaskle v. Wiggins*:

> A *pro se* defendant must generally accept any unsolicited help or hindrance that may come from the judge who chooses to call and question witnesses, from the prosecutor who faithfully exercises his duty to present evidence favorable to the defense, from the plural voices speaking "for the defense" in a trial of more than one defendant, or from an *amicus* counsel appointed to assist the court.[18]

---

[14]*Faretta*, 422 U.S. at 835.

[15]*Id*. at 834 n.46.

[16]*Id*. Furthermore, "[t]he right of self-representation is not a license to abuse the dignity of the courtroom . . . [or] not to comply with relevant rules of procedural and substantive law." *Id*.

[17]*Id*. at 846 n.7 (Burger, C. J., dissenting).

[18]465 U.S. 168, 177 n.7 (1984) (citation omitted).

Accordingly, in *Martinez v. Court of Appeal of California*, the Court flatly stated that, "[a]s the *Faretta* opinion recognized, the right to self-representation is not absolute."[19] After listing several exceptions and qualifications to the right of self-representation, the *Martinez* Court concluded that "the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer."[20] Moreover, in holding that *Faretta* does not require a state to recognize a constitutional right to self-representation on direct appeal from a criminal conviction, the Court in *Martinez* gave reasons that are significant to the present case:

> The status of the accused defendant, who retains a presumption of innocence throughout the trial process, changes dramatically when a jury returns a guilty verdict.
> . . .
>         . . . .
>         . . . Yet the overriding state interest in the fair and efficient administration of justice remains as strong as at the trial level. Thus, the States are clearly within their discretion to conclude that the government's interests outweigh an invasion of the appellant's interest in self-representation.[21]

The majority's decision to issue mandamus and reverse the district court's order is incongruous with all of the Supreme Court's cases; it permits the right of self-representation to be torn from the body of the basic Sixth Amendment right to make an adversarial defense and to be used

---

[19]528 U.S. 152, 161 (2000).

[20]*Id*. at 162. *See id.* at 161–62 (listing some limitations upon the right: "The defendant must voluntarily and intelligently elect to conduct his own defense, and most courts require him to do so in a timely manner. He must first be made aware of the dangers and disadvantages of self-representation. A trial judge may also terminate self-representation or appoint standby counsel—even over the defendant's objection—if necessary. We have further held that standby counsel may participate in the trial proceedings, even without the express consent of the defendant, as long as that participation does not seriously undermine the appearance before the jury that the defendant is representing himself. Additionally, the trial judge is under no duty to provide personal instruction on courtroom procedure or to perform any legal chores for the defendant that counsel would normally carry out.") (internal quotations and citations omitted).

[21]*Id*. at 162–63.

to defeat the hopes and aspirations of that basic constitutionalized right. The majority's prior mandamus should not have issued because the district court was not clearly and indisputably wrong in refusing to allow Davis to waive his right to assistance of counsel and to represent himself. Davis had expressly informed the court that he would not use self-representation to make an adversarial defense as contemplated and protected by the Sixth Amendment.[22] Instead, as he expressly stated, he intended to make no defense whatsoever, so as to ensure a death sentence.[23] Under these

---

[22]After this court reversed his federal death sentence and remanded his case for a new penalty trial, Len Davis informed the district court that he intended to represent himself in those proceedings but also consented to the presence of appointed "co-counsel." The government first moved for a mental status examination of Davis and then filed an objection to this "hybrid representation." In a *pro se* response to the government's objection, Davis said:

> I do not beg for my life, and I am not afraid to die. I have already informed the Court that I do not intend to present a defense at the penalty trial, and the government has filed pleadings with the Court stating that the decision is so bizarre that it calls into question my mental competence.

[23]Len Davis's Original Brief, filed by his counsel in this court on June 8, 2001, states:

> At various conferences and hearings before [the] district court Mr. Davis announced that he did not intend to present any evidence, or participate in any aspect of the trial, directed toward convincing the jury that he should not receive the death penalty. . . .
>
> . . . .
>
> . . . Mr. Davis believes that the[] legal issues [he plans to raise in a motion for new trial and/or Rule 2255 motion] will of necessity have to be viewed much more closely by the district and appellate courts if he is facing a death sentence, than they would if he were facing a life sentence. While he has no desire to die he has weighed carefully the prospects of a death sentence against spending the rest of his life in jail - and he finds life in prison to be more onerous. Believing that legal errors that led to his conviction will be examined more scrupulously if he has a death sentence facing him, Mr. Davis made the strategic decision that he does not want to put on mitigating evidence in an effort to convince the jury that he should not die. . . .
>
> . . . .
>
> . . . [W]e believe that the legal strategy which he has undertaken will likely result in his execution. Conversely we believe that if we could mount a full mitigation defense that there is a very good possibility we could save his life. That being so, why are we before this Court arguing a legal position which, if successful, would likely doom our client? The answer lies in the *Faretta* decision. It is his life, not ours. "The right to defend is given directly to the accused; for it is he who suffers the

circumstances, the national interest in the fair and efficient administration of justice outweighed the defendant's interest in acting as his own lawyer, since his purpose was to defeat or relinquish his Sixth Amendment right to make a defense in an adversarial criminal proceeding.[24] The present mandamus should not issue for the same reasons and also because the Supreme Court clearly left open to the district court the option that it pursued on remand, namely, appointing a qualified lawyer to sit in the case as amicus curiae or friend of the court to safeguard the national interest in the integrity and fairness of the sentencing hearing and to mitigate some of the damage that will surely result from Davis's decision not to make any defense against the death penalty.

## II. MITIGATING FACTORS AND THE EIGHTH AMENDMENT

In *Woodson v. North Carolina*, a plurality of the Supreme Court stated that

> the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.[25]

This emphasis on individualized sentencing contributed to what Justice O'Connor would later identify as a

---

consequences if the defense fails." *Faretta v. California*, [422 U.S. 806, 820 (1975)]. Appellant's Opening Brief at 5–13 (June 8, 2001).

Moreover, at an August 3, 2001 status conference, Davis explained that his refusal to defend himself against the death penalty "is part of my strategy and I think that with the death sentence it will force the Court to take my issues a little more seriously."

[24]As stated by the district court:

> In this case, Davis has persisted in his intention that the jury not have the benefit of any mitigating evidence in the penalty phase of his case. Most recently, he has declared that he wants nothing done at the penalty phase on his behalf at all. To permit Davis to withhold from the jury relevant mitigation undermines the integrity of the judicial process, defeats the reliability of the outcome and subverts our adversary system of justice. Davis in effect is appropriating to himself a judgment that only society, through the jury in this case, can properly make.

*United States v. Davis*, 150 F. Supp. 2d 918, 926 (E.D. La. 2001).

[25]428 U.S. 280, 305 (1976) (opinion of Stewart, Powell, and Stevens, JJ.).

tension that has long existed between the two central principles of our Eighth Amendment jurisprudence. In *Gregg v. Georgia*, Justices Stewart, Powell, and Stevens concluded that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." In capital sentencing, therefore, discretion must be "controlled by clear and objective standards so as to produce nondiscriminatory application." On the other hand, this Court has also held that a sentencing body must be able to consider any relevant mitigating evidence regarding the defendant's character or background, and the circumstances of the particular offense.[26]

"Thus, the Constitution, by requiring a heightened degree of fairness to the individual, and also a greater degree of equality and rationality in the administration of death, demands sentencer discretion that is at once generously expanded and severely restricted."[27] Although this seemingly paradoxical result has been challenged by minority views,[28] it remains the Law of the Land that a sentencing body in a capital case must consider any relevant mitigating evidence.[29] As stated by the

---

[26]*California v. Brown*, 479 U.S. 538, 544 (1987) (O'Connor, J., concurring) (internal citations omitted).

[27]*Callins v. Collins*, 510 U.S. 1141, 1151 (1994) (Blackmun, J., dissenting).

[28]*See id.* at 1157 (Blackmun, J., dissenting) ("In my view, the proper course when faced with irreconcilable constitutional commands is not to ignore one or the other, nor to pretend that the dilemma does not exist, but to admit the futility of the effort to harmonize them. This means accepting the fact that the death penalty cannot be administered in accord with our Constitution."). *But see id.* at 1142–43 (Scalia, J., concurring) ("Surely a different conclusion commends itself—to wit, that at least one of these judicially announced irreconcilable commands which cause the Constitution to prohibit what its text explicitly permits must be wrong. . . . [D]eath-by-injection . . . . looks pretty desirable next to . . . some of the other cases currently before us which Justice Blackmun did not select as the vehicle for his announcement that the death penalty is always unconstitutional—for example, the case of the 11-year-old girl raped by four men and then killed by stuffing her panties down her throat. How enviable a quiet death by lethal injection compared with that!") (citation omitted).

[29]In *Lockett v. Ohio*, Chief Justice Burger stated:
There is no perfect procedure for deciding in which cases governmental authority should be used to impose death. But a statute that prevents the sentencer in all capital

Court in *Penry v. Lynaugh*, "[i]n order to ensure 'reliability in the determination that death is the appropriate punishment in a specific case,' the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime."[30]

## III.   DAVIS DOES NOT HAVE A CLEAR AND INDISPUTABLE RIGHT TO MANDAMUS RELIEF

In the order presently at issue, the district court explained:

The public has a substantial independent interest in being assured of a full and fair sentencing proceeding, in compliance with constitutional and statutory requirements, so that the death penalty is not imposed arbitrarily and capriciously.  In order to accommodate this interest, the Court will appoint independent counsel to investigate and present mitigation evidence at the penalty phase.  Counsel will be clearly identified as *not* representing Davis, and Davis will be permitted to present whatever defense he deems appropriate on his own behalf.[31]

---

cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty.  When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments.

438 U.S. 586, 605 (1978) (plurality opinion).  In *Eddings v. Oklahoma*, 455 U.S. 104 (1982), a majority of the Court reaffirmed that a sentencer may not be precluded from considering, and may not refuse to consider, relevant mitigating factors.  Attempting, perhaps, to harmonize the "two central principles" of the Court's Eighth Amendment jurisprudence, *see supra* text accompanying note 18, Justice Powell wrote:

Thus, the rule in *Lockett* followed from the earlier decisions of the Court and from the Court's insistence that capital punishment be imposed fairly, and with reasonable consistency, or not at all. . . .   By holding that the sentencer in capital cases must be permitted to consider any relevant mitigating factor, the rule in *Lockett* recognizes that a consistency produced by ignoring individual differences is a false consistency.

*Id.* at 112.

[30]492 U.S. 302, 328 (1989) (quoting *Woodson*, 428 U.S. at 305).

[31]*United States v. Davis*, 180 F. Supp. 2d 797, 798 (E.D. La. 2001) ("*Davis II*").

For Davis to establish entitlement to mandamus relief, he "must show not only that the district court erred, but that it clearly and indisputably erred."[32] Concluding that Davis satisfied this burden, the majority relies on a purported absence of statutory or case law authority and an analogy that it draws between the district court's order and the judicial appointment of special prosecutors. Both lines of reasoning are flawed and reflect the majority's misunderstanding of the nature and scope of Davis's right to self-representation.

## A. *Statutory Authority and Constitutional Interpretation*

Finding "no federal statutory authority for appointing an independent counsel to present mitigation evidence in the penalty phase of a capital case,"[33] the majority conspicuously ignores the Federal Death Penalty Act of 1994.[34] Title 18 U.S.C. § 3593(b) provides that when a criminal defendant is found guilty or pleads guilty to an offense punishable by death, the presiding judge "*shall* conduct a separate sentencing hearing to determine the punishment to be imposed."[35] In determining whether a sentence of death is justified, the finder of fact at the sentencing hearing "*shall* consider any mitigating factor. . . ."[36] The ordinary, mandatory meaning of the word "shall"[37] and the comprehensiveness of the FDPA permit only one conclusion: although a defendant may enter a guilty

---

[32]*In re: Santa Fe Int'l Corp.*, 272 F.3d 705, 714 (5th Cir. 2001) (internal quotation omitted).

[33]Maj. Op. at 7.

[34]*See* 18 U.S.C. §§ 3591–3598.

[35]*Id.* § 3593(b) (emphasis added).

[36]*Id.* § 3592(a) (emphasis added).

[37]*See Save Our Wetlands, Inc. v. Sands*, 711 F.2d 634, 641 (5th Cir. 1983). *See also Escondido Mut. Water Co. v. La Jolla Band of Mission Indians*, 466 U.S. 765, 772 (1984).

plea and thereby become *eligible* to receive a death sentence, he is not entitled to a choice of penalty. This conclusion reflects Congress's effort, in passing the FDPA, to comply with the Supreme Court's Eighth Amendment jurisprudence, which holds that a death penalty scheme may not limit the sentencer's consideration of mitigating evidence and corresponding discretion to extend mercy in a given case.[38]

In the typical case contemplated by the FDPA, the convicted defendant presents the mitigating factors that allow the jury to consider a life sentence. But when the adversary system malfunctions, as it does here, the district court is not free to disregard the constitutional and statutory requirement that mitigating evidence and a life sentence be considered. So, while I do not suggest that a convicted defendant can never represent himself and pursue his own strategy in the sentencing phase of a capital case, Davis's admitted attempt to secure a death sentence by not making a defense creates the impermissible risk that the death penalty will not be imposed in accordance with constitutional and statutory law. Thus, I do not think that the district court, in appointing independent counsel for the limited purpose of presenting mitigating evidence, reached an improper balance between the conflicting self-representation and Eighth Amendment concerns in its effort to maintain the integrity of the sentencing hearing required by the FDPA.

As constitutional scholars have observed, "Whenever possible, conflicting [constitutional]

---

[38]*See supra* Part II. *See also United States v. X-Citement Video,* 513 U.S. 64, 73 (1994) ("[W]e do not impute to Congress an intent to pass legislation that is inconsistent with the Constitution as construed by this Court.").

provisions should be reconciled and construed so as to give effect to both."[39] The Supreme Court

has consistently refused to assign priority among the safeguards enumerated in the Bill of Rights.[40]

This case presents a conflict between self-representation and Eighth Amendment interests.[41] The

district court's reconciliation of these constitutionally protected interests is manifestly reasonable—so

much so that it calls to mind Justice Clark's admonition that "[t]here is no war between the

Constitution and common sense."[42] In *Wheat v. United States*, the Court stated that "the essential

aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant. . .

---

[39]5 RONALD D. ROTUNDA & JOHN E. NOWAK, TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE § 23.17, at 256 (3d ed. 1999). The Supreme Court delivered the classic statement of this principle in *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264 (1821):

> What then, becomes the duty of the court? Certainly, we think, so to construe the constitution, as to give effect to both provisions, so far as it is possible to reconcile them, and not to permit their seeming repugnancy to destroy each other. We must endeavor so to construe them, as to preserve the true intent and meaning of the instrument.

Chief Justice John Marshall, who wrote the *Cohens* opinion, had previously stated in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 174 (1803), that "[i]t cannot be presumed that any clause in the constitution is intended to be without effect. . . ."

[40]*See, e.g., Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 561 (1976) (refusing to declare the Sixth Amendment rights of an accused subordinate, in all circumstances, to the First Amendment right of the press to publish).

[41]More accurately, this case presents this conflict in its present posture. I remain convinced that the district court reached the correct result in its May 16, 2001 order by refusing to allow Len Davis to waive his right to counsel and use self-representation to make no defense against the death penalty. *See United States v. Davis*, 150 F. Supp. 2d 918 (E.D. La. 2001). My confidence in this result reflects the Supreme Court's recognition of exceptions and limitations to the right of self-representation. *See supra* notes 4–13 and accompanying text. But the majority nevertheless issued a writ of mandamus on July 17, 2001 requiring the district court to accept Davis's waiver of counsel and self-representation. That order created the conflict between Sixth and Eighth Amendment interests that the district court addressed through its appointment of independent or amicus curiae counsel.

[42]*Mapp v. Ohio*, 367 U.S. 643, 657 (1961).

.”[43] So, “in evaluating Sixth Amendment claims, the appropriate inquiry focuses on the adversarial process. . . .”[44] While *Faretta* recognizes a criminal defendant's right to serve as his own advocate in opposition to the prosecuting authority, neither it nor any of the Court's other cases may be read to permit the right to be exercised in a non-adversarial manner. “Without opponents, the adversary system cannot function.”[45] Seeking to remedy this defect, the district court attempted to accommodate both the majority's view of the right of self-representation and the Eighth Amendment requirement that mitigating factors be considered within a capital sentencing proceeding. As the district court explained,

> ours is an adversarial system with opposing sides. . . . The Government is expected to “take a side.” The independent counsel envisioned here is to protect the public interest in the fairness and integrity of the proceeding by assuring that the jury has *all* the information needed to make an informed decision.[46]

Given the majority's prior mandamus upholding Davis's peculiar form of self-representation, the district court struck a reasonable balance between the competing constitutional concerns, thereby giving effect to both. Moreover, because the FDPA, which observes the Eighth Amendment guidelines set forth by the Supreme Court, arguably furnishes a statutory basis for the appointment of independent counsel in this case,[47] I find it impossible to conclude that the district court clearly and

---

[43]486 U.S. 153, 159 (1988).

[44]*Id.* (internal quotation omitted).

[45]*United States v. Chagra*, 701 F.2d 354, 361 (5th Cir. 1983) (Rubin, J.).

[46]*Davis II*, 180 F. Supp. 2d at 798 n.2.

[47]The appointment of independent counsel is completely consistent with *Faretta* and *McKaskle*. *See supra* text accompanying notes 9–10.

indisputably erred.

**B.** *The False Analogy*

The majority finds that the district court improperly appointed independent counsel because, "[i]n the reverse but analogous scenario,"[48] a district judge cannot appoint special prosecutors when the government elects not to prosecute. Although the appointment of a special prosecutor in such a case might be viewed as a "reverse scenario," the analogy is false. Indeed, the majority acknowledges that separation of powers concerns, not involved in Davis's case, were raised in the special prosecutor context: "'It follows, as an incident of the constitutional separation of powers, that the courts are not to interfere with the free exercise of the discretionary powers of the attorneys of the United States in their control over criminal prosecutions.'"[49] In the present case, respect for a coequal branch of government is not at issue. Furthermore, neither the Constitution nor a congressional enactment commits the presentation of mitigating factors in the penalty phase of this capital case to the exclusive discretion of either the government or Len Davis.[50] In the absence of a constitutional or statutory grant of exclusive discretionary power, it simply does not follow that

_____

[48]Maj. Op. at 7.

[49]*Id.* at 9 (quoting *United States v. Cox*, 342 F.2d 167, 171 (5th Cir. 1965)).

[50]The Supreme Court's "self-representation" jurisprudence also does not support the majority's requirement that all mitigating evidence received at the federal capital sentencing hearing be presented by the convicted defendant or with his blessing. *See Faretta v. California*, 422 U.S. 806, 846 n.7 (1975) (Burger, C. J., dissenting) ("Some of the damage we can anticipate from a defendant's ill-advised insistence on conducting his own defense may be mitigated by appointing a qualified lawyer to sit in the case as the traditional 'friend of the court.' The Court does not foreclose this option."); *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.7 (1984) ("A *pro se* defendant must generally accept any unsolicited help or hindrance that may come from . . . an *amicus* counsel appointed to assist the court.") (citation omitted).

"[t]here is little distinction between special prosecutors and special (independent) counsel. . . ."[51] Thus, the majority's scholarly survey of prosecutorial discretion is inapposite to this case.

Although I adhere to my previous statement that the FDPA may provide a statutory basis for the appointment of independent counsel, I also disagree with the majority's conclusion, drawn from its false analogy, that the district court had no inherent power to appoint an independent counsel. I agree, instead, with the district court's recognition that "[a]s a general proposition, the authority of a court to appoint independent or amicus curiae counsel is broad and well-established."[52] The exercise of this authority is particularly appropriate in cases that challenge the proper functioning of the adversary system because a "case conceived in cooperation may be saved by intervention of a genuine adversary who represents the rights that otherwise might be adversely affected."[53] The district court's order merely attempts to preserve the adversarial posture required by the constitutional and statutory provisions relevant to this case.[54]

## C.  *Additional Authority Supporting the District Court's Order*

It is true that there are no cases explicitly affirming the propriety of appointing independent counsel to develop and present mitigating evidence in a federal capital sentencing proceeding because

---

[51]Maj. Op. at 10.

[52]*Davis II*, 180 F. Supp. 2d at 799–800. *See United States v. Louisiana*, 751 F. Supp. 608, 620 (E.D. La. 1990), and the authorities cited therein. *See also supra* note 42.

[53]13 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3530, at 319 (2d ed. 1984). *See also United States v. Chagra*, 701 F.2d 354, 361 (5th Cir. 1983) (Rubin, J.).

[54]*See supra* Parts II–III.A.

of the convicted defendant's refusal to do so.[55]  But it is precisely the *res nova* status of this case that demands this court's consideration of any credible authority that addresses the issues now before us. Judge Berrigan examined various state courts' treatment of the specific issue of appointing independent counsel in a capital sentencing proceeding and found ample support for her order.[56]  For example, in *Muhammad v. State*, the Supreme Court of Florida established the following responsive measures for cases where a convicted defendant refuses to present mitigating evidence:

> Having continued to struggle with how to ensure reliability, fairness, and uniformity in the imposition of the death penalty in these rare cases where the defendant waives mitigation, we have now concluded that the better policy will be to require the preparation of a PSI [(presentence investigation report)] in every case where the defendant is not challenging the imposition of the death penalty and refuses to present mitigation evidence.  To be meaningful, the PSI should be comprehensive and should include information such as previous mental health problems (including hospitalizations), school records, and relevant family background.  In addition, the trial court could require the State to place in the record all evidence in its possession of a mitigating nature such as school records, military records, and medical records. Further, if the PSI and the accompanying records alert the trial court to the probability of significant mitigation, the trial court has the discretion to call persons with mitigating evidence as its own witnesses.  This precise procedure has been suggested by the New Jersey Supreme Court in *State v. Koedatich*, 112 N.J. 225, 548 A.2d 939, 992 (1988), and recognized as appropriate by the Georgia Supreme Court in *Morrison v. State*, 258 Ga. 683, 373 S.E.2d 506, 509 (1988).  *If the trial court prefers that counsel present mitigation rather than calling its own witnesses, the trial court possesses the discretion to appoint counsel to present the mitigation* as was done in *Klokoc v. State*, 589 So.2d 219 (Fla.1991) or to utilize standby counsel for this limited purpose.[57]

---

[55]This dearth of case law reflects that prior to 2001, the federal government had not executed a civilian since 1963.  Timothy James McVeigh, convicted of the April 1995 bombing of the Alfred P. Murrah Federal Building in Oklahoma City, was executed on June 11, 2001.  His immediate predecessor to federal capital punishment was convicted murderer Victor Feguer, who was executed on March 15, 1963.

[56]*See Davis II*, 180 F. Supp. 2d at 804–07.

[57]782 So. 2d 343, 363–64 (Fla. 2001) (footnotes omitted) (emphasis added).

In Florida, the jury serves in an advisory capacity only; the trial judge makes the final penalty decision. When a convicted defendant does not oppose the death penalty, the now-mandated presentence investigation report facilitates an informed decision as to whether a death sentence should be imposed by providing the trial judge with the available mitigating evidence or alerting him, in certain cases, to "the probability of significant mitigation."

In *Smith v. State*,[58] the Supreme Court of Indiana found no error in a trial court's refusal to appoint special counsel to gather and present mitigating evidence at the sentencing hearing of a defendant who negotiated a plea agreement that called for the death penalty. Although the court reached a different conclusion from its Florida counterpart on the propriety of appointed counsel, it noted that Indiana law requires the trial court, acting through its probation department, to investigate the defendant's background and any mitigating circumstances.[59] This investigation "culminates in a [presentence] report to be considered before determining the appropriateness of the death sentence."[60] The court admitted that discovering mitigating evidence "is more difficult when the defendant does not wish to assist, but it is not impossible."[61] It then found that the probation department made a "good faith effort" to uncover mitigating evidence despite Smith's refusal to provide it and concluded that the presentence report and the record as a whole "reflects that Smith's death sentence was

[58]686 N.E.2d 1264 (Ind. 1997).

[59]*See id.* at 1276.

[60]*Id.*

[61]*Id.*

-31-

appropriate to the nature of the offense and offender."[62]

The FDPA, on the other hand, states that "no presentence report shall be prepared" when a defendant is found guilty or pleads guilty to an offense punishable by death.[63] The jury—or the court alone if there is no jury—is therefore limited to the information received during the sentencing hearing.[64] Thus, the district court recognized the importance of presenting mitigating evidence at the hearing, "as that is the only opportunity for it to be heard."[65] While Davis can certainly control the information he gives, today's decision by the majority extends his control to all mitigating evidence, regardless of its source or potential impact on the sentencing body. The district court reasonably concluded that a death sentence obtained in such a distorted manner is likely to fall short of constitutional standards of reliability.

Like the majority, the states that have taken an absolutist position on the convicted defendant's right to self-representation have done so in misguided reliance on the Supreme Court's decision in *Faretta*.[66] But in its most recent pronouncement on *Faretta*, *Martinez v. Court of Appeal of California*, the Supreme Court recognized that "the right to self-representation is not absolute," that "[e]ven at the trial level . . . the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer," and that "[t]he status

---

[62]*Id.*

[63]18 U.S.C. § 3593(c).

[64]*See id.* § 3593(d).

[65]*Davis II*, 180 F. Supp. 2d at 806.

[66]*See, e.g., People v. Bloom*, 774 P.2d 698 (Cal. 1989).

of the accused defendant, who retains a presumption of innocence throughout the trial process, changes dramatically when a jury returns a guilty verdict."[67] "[T]he autonomy interests that survive a felony conviction are less compelling than those motivating the decision in *Faretta*."[68] "Yet the overriding state interest in the fair and efficient administration of justice remains" constantly strong throughout the trial and appeal.[69]

As in an appeal, the defendant entering the sentencing phase of a capital case has already been convicted. Applying *Martinez* by analogy to the present case, it follows that Len Davis's autonomy interests, which became less compelling after his conviction, have been further diminished by the purpose for which he seeks to act as his own attorney. His purpose is neither to disengage from unreliable or incompetent counsel nor to make a personal, adversarial defense, but rather to ensure a death sentence by offering no defense at all. The holding and reasoning of *Faretta* do not sanction self-representation by a convicted defendant who seeks to render himself defenseless against the death penalty. In other words, the autonomy interests that survived Davis's conviction are now outweighed by the public's interest in the fair and faithful administration of justice, an interest that is even more acute in a death penalty case. Therefore, the district court's appointment of independent counsel to represent this national interest did not deprive Davis of a constitutional right.

Len Davis does not have an absolute right to his desired sentence.[70] The district court

---

[67]528 U.S. 152, 162 (2000).

[68]*Id.* at 163.

[69]*Id.*

[70]In the words of Justice Thurgood Marshall, "[a] defendant's voluntary submission to a barbaric punishment does not ameliorate the harm that imposing such a punishment causes to our

understood this, and its meticulous consideration of the issues before it further demonstrates that the

extraordinary writ of mandamus should not issue again in this case. The majority's decision to the

contrary plainly retrogresses from the constitutional command that "capital punishment be imposed

fairly, and with reasonable certainty, or not at all."[71]

## IV.    CONCLUSION

In my opinion, the district court reached the correct result in May 2001 when it refused, based

on the facts of this particular case, to permit Len Davis to waive his right to counsel and to represent

himself at his capital sentencing hearing, and the majority erred in issuing its first mandamus setting

the district court's ruling aside. In the present proceedings, given the situation in which the majority

placed the district court by issuing its first mandamus, the district court's August 2001 order

appointing independent counsel for the limited purpose of presenting mitigating evidence at the

sentencing hearing was not clearly and indisputably wrong. The majority's contrary conclusion and

second mandamus voiding the district court's ruling perverts *Faretta*, ignores the national public

interest in the fair and faithful administration of the federal capital punishment system, and converts

---

basic societal values and to the integrity of our system of justice." *Whitmore v. Arkansas*, 495 U.S. 149, 173 (1990) (Marshall, J., dissenting). Consequently, cases such as the one before us do not involve a capital defendant's so-called "right to die." When a capital defendant seeks to circumvent procedures necessary to ensure the propriety of his conviction and sentence, he does not ask the State to permit him to take his own life. Rather, he invites the State to violate two of the most basic norms of a civilized society—that the State's penal authority be invoked only where necessary to serve the ends of justice, not the ends of a particular individual, and that punishment be imposed only where the State has adequate assurance that the punishment is justified. The Constitution forbids the State to accept that invitation.

*Id.*

[71]*Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982).

the sentencing hearing into a non-adversarial criminal proceeding not contemplated by the Sixth

Amendment or the FDPA.[72]

---

[72]Moreover, the disintegration of the adversarial nature of the sentencing proceeding raises a serious jurisdictional question. *See* 13 WRIGHT ET AL., *supra* note 45, § 3530, at 317 ("The principle remains today that if both parties affirmatively desire the same result, no justiciable case is presented.").